JOHN D. CHEEVER, Appellant, *v.* THE PITTSBURGH, SHENANGO AND LAKE ERIE RAILROAD COMPANY, Respondent.

1. DIVERTED NEGOTIABLE PAPER — RIGHTS OF HOLDER FOR VALUE. The rights of a holder of wrongfully diverted negotiable paper, acquired by him for value before due, cannot be defeated without proof of actual notice of the defect in title, or bad faith on his part evidenced by circumstances.

2. PRESUMPTION AS TO RELATIONS OF PARTIES TO NEGOTIABLE PAPER. One who takes negotiable paper for value before due, without actual notice of any defect therein, has the right to assume that the relations to the paper of every party whose name appears on it are precisely what they appear to be.

3. WRONGFUL DEALINGS BY OFFICER OF CORPORATION WITH NEGOTIABLE CORPORATE PAPER, ORIGINALLY PAYABLE TO A THIRD PARTY. The principle, that where an officer or agent of a corporation makes a corporate obligation payable to himself, it bears upon its face sufficient notice of his incapacity to issue it, when he attempts to deal with it for his own benefit, does not apply where an officer or agent deals with a corporate note, executed by himself as such officer or agent, but originally payable to a third party, and which, so far as appears upon its face, had been regularly issued to the original payee and by him transferred to a firm of which the officer is a member and for which he acted in dealing with the note.

4. RIGHTS OF HOLDER, FOR VALUE, OF CORPORATE PROMISSORY NOTE ORIGINALLY PAYABLE TO A THIRD PARTY, WRONGFULLY NEGOTIATED BY THE OFFICER BY WHOM EXECUTED. If the president of a corporation, who is authorized to make corporate notes for a corporate purpose, makes a corporate note regular in form and attested by the secretary, payable to the order of a third party, who in fact has no interest therein, and the note is indorsed by the nominal payee, to a mercantile firm of which the president is a member, or in blank, and then indorsed by the firm, and the president thereafter wrongfully delivers the note, before maturity, to a stranger having no actual knowledge or notice of a defect in the title, as collateral security for a cash advance of more than its amount upon a note of the firm and for its benefit, the fact that the corporate note bears upon its face the signature, as president, of the party dealing with it, is not sufficient to put the transferee upon inquiry, so as to render him chargeable with knowledge of all the facts that such inquiry would have revealed, and hence does not deprive him, as matter of law, of the character of a *bona fide* purchaser, so as to prevent him, on becoming absolute owner of the note after its maturity, by consent of the pledgor and application of its proceeds upon the debt, or a subsequent holder, for value, from enforcing the note against the corporation.

*Cheever* v. *P., S. & L. E. R. R. Co.*, 72 Hun, 380, reversed.

(Argued April 22, 1896; decided October 6, 1896.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made October 13, 1893, which overruled plaintiff's exceptions taken on the trial at Circuit and ordered to be heard in the first instance at General Term, and directed judgment for the defendant dismissing the plaintiff's complaint as to the first and second causes of action therein contained.

The nature of the action and the facts, so far as material, are stated in the opinions.

*Austen G. Fox* for appellant. The presumption is that the rights and relations of parties to negotiable paper are precisely such as they appear upon its face to be. (*Hoge* v. *Lansing*, 35 N. Y. 136; *Colson* v. *Arnot*, 57 N. Y. 259.) When these notes were offered as collateral security for a loan to the firm of M. S. Frost & Son, each note, upon its face, appeared to be, not a corporate obligation created by the president in his own favor, but, rather, a corporate obligation issued regu-

larly, for value, to a stranger, John T. Bruen, and indorsed by him, for value, to M. S. Frost & Son, who were then the ostensible owners. (*Hoge* v. *Lansing*, 35 N. Y. 136; *M. B. Assn.* v. *N. Y. & S. W. L. Co.*, 35 N. Y. 505; *Belmont Branch Bank* v. *Hoge*, 35 N. Y. 65; *Magee* v. *Badger*, 34 N. Y. 247; *Colson* v. *Arnot*, 57 N. Y. 259; *Central Bank of B.* v. *Hammett*, 50 N. Y. 158; *Jarvis* v. *M. B. Co.*, 148 N. Y. 652; *Goodman* v. *Simonds*, 20 How. [U. S.] 365, 366.) The fact that Mr. Frost, who presented the notes on behalf of M. S. Frost & Son, was president of the defendant corporation did not show, as matter of law, that the firm of M. S. Frost & Son were not the owners of the notes. (*Ex parte Bushnell*, 3 M., D. & DeG. 615; *Exchange Bank* v. *Monteath*, 26 N. Y. 505; 17 Barb. 171; *Bank of N. Y. N. B. Assn.* v. *A. D. & T. Co.*, 143 N. Y. 559; *Jarvis* v. *M. B. Co.*, 148 N. Y. 652; *Bank of Genesee* v. *Patchin Bank*, 13 N. Y. 309; *F. & M. Bank* v. *B. & D. Bank*, 16 N. Y. 125; *Smith* v. *Lusher*, 5 Cow. 688, 711; *Gale* v. *Miller*, 44 Barb. 420; *Ridley* v. *Taylor*, 13 East, 175; *Swan* v. *Steele*, 7 East, 210.) The president having been authorized to give the corporate notes to the amount of $10,000, it is no defense as against a purchaser for value, without notice, for the corporation to show that the president abused his authority, and did not apply the notes to the purpose which was indicated in the resolution of authority. (*Jarvis* v. *M. B. Co.*, 148 N. Y. 652; *Bank of Bengal* v. *Macleod*, 7 Moore P. C. 35; *Ridway* v. *Farmers' Bank*, 12 S. & R. 255; *City of Lexington* v. *Butler*, 14 Wall. 282; *Exchange Bank* v. *Monteath*, 17 Barb. 171.)

*Frank Sullivan Smith* for respondent. The plaintiff is not a *bona fide* holder of the notes, for value, without notice of facts affecting their validity before maturity, and in the usual course of business, and, therefore, cannot recover upon said notes. (*Wilson* v. *M. E. R. Co.*, 120 N. Y. 145; *A. E. Nat. Bank* v. *N. Y. B. & P. Co.*, 148 N. Y. 698; *M. L. Ins. Co.* v. *F. S. St., etc., R. R. Co.*, 139 N. Y. 146, 151; *Gerard* v. *McCormick*, 130 N. Y. 261; *Pendleton* v. *Fay*, 2 Paige, 202; *Shaw*

*v. Spencer*, 100 Mass. 388; *Garrard* v. *P. & C. R. R. Co.*, 29 Penn. St. 154; *Farrington* v. *S. B. R. R. Co.*, 150 Mass. 406; *Petre* v. *Clark*, 11 S. & R. 377; *Culver* v. *R. R. E. Co.*, 91 Penn. St. 367.) The pledge of the notes in suit by the president of the railroad company was unauthorized and cannot bind the defendant. (*Shaw* v. *S. H. N. Co.*, 144 N. Y. 220; *Cumming* v. *Williamson*, 1 Sandf. Ch. 17; *Waldron* v. *McComb*, 1 Hill, 111; *Bloomer* v. *Waldron*, 3 Hill, 361; *A. F. Ins. Co.* v. *Bay*, 4 N. Y. 9; *Merchants' Bank of C.* v. *Livingston*, 74 N. Y. 223; Wright on Agency, 79; Mechem on Agency, § 356; Story on Agency, 78; Randolph on Comcl. Paper, § 794; *Bank of Bengal* v. *Macleod*, 7 Moore P. C. 35; *Francia* v. *Joseph*, 3 Edw. Ch. 182; *Perry* v. *C. B. C. W. W. Co.*, 67 Hun, 456; 143 N. Y. 637.) The trial court properly declined to submit to the jury any of the questions proposed by the plaintiff, and properly directed a verdict in favor of the plaintiff. (*Wilson* v. *M. E. R. Co.*, 120 N. Y. 145; *Pendleton* v. *Fay*, 2 Paige, 202; *Garrard* v. *P. & C. R. R. Co.*, 29 Penn. St. 154; *Shaw* v. *Spencer*, 100 Mass. 388; Thompson on Trials, § 1931; *Williams* v. *Hartshorn*, 30 Ala. 211; *Hardy* v. *Simpson*, 13 Ired. L. 132, 139; *Sturtevant* v. *Ballard*, 9 Johns. 337; *Narsley* v. *De Mattos*, 1 Burr. 467; Bigelow on Fraud (1st ed.), 468; *Gage* v. *Parker*, 25 Barb. 141, 145; *Erwin* v. *Voorhees*, 26 Barb. 127.)

O'BRIEN, J. The complaint in this action contained four separate causes of action, each upon a promissory note of the defendant. The last two causes of action were not defended, and upon these the plaintiff recovered, but was defeated upon the two notes embraced in the first and second causes of action. The defense to these two notes was that they were made by the defendant's president, one M. S. Frost, and by him wrongfully diverted from the uses and purposes for which they were intended to his own personal or private benefit, or the benefit of a firm of which he was a member, and that the plaintiff is not a *bona fide* holder, but chargeable with notice of these facts.

The following are copies of the two notes in controversy, with the indorsements thereon when put in circulation by the defendant's president:

" $5,000.                      GREENVILLE, PA., *Feb'y 24th*, 1888.

" Four months after date the Pittsburgh, Shenango and Lake Erie Railroad Company promises to pay to the order of John T. Bruen five thousand dollars, at the American Exchange National Bank, New York City.

" Value received.        THE PITTSBURGH, SHENANGO
 " Attest,                    & LAKE ERIE RAILROAD
  " E. S. TEMPLETON,        COMPANY.
    " *Secretary.*            By M. S. FROST,
             " *President.*"

Indorsed :
 " Pay to the order of M. S. FROST & SON,
        " JOHN T. BRUEN,
        " M. S. FROST & SON."

" $5,000.00                  GREENVILLE, PA., *Feb'y 24th*, 1888.

" Three months after date the Pittsburgh, Shenango and Lake Erie Railroad Company promises to pay to the order of John T. Bruen five thousand dollars, at the American Exchange National Bank, New York City.

" Value received.        THE PITTSBURGH, SHENANGO
 " Attest,                    & LAKE ERIE RAILROAD
  " E. S. TEMPLETON,        COMPANY.
    " *Secretary.* .          By M. S. FROST,
             " *President.*"

Indorsed — " JOHN T. BRUEN,
    " M. S. FROST & SON."

The body of these notes and every part of them except the signature of the president was in the handwriting of Templeton, the secretary.. The president was authorized by the board of directors to issue the corporate notes to the extent of $10,000 for the purpose of purchasing flat cars. In March, 1888, before the notes became due, Frost went to Boston and there negotiated a cash loan of $30,000 from

Francis A. Brooks for the benefit of M. S. Frost & Son, giving the firm note therefor and delivering to him the two notes in question, indorsed as they now appear, with other obligations, as collateral security for the payment of this loan. Subsequent to the maturity of the notes Brooks became the absolute owner by consent of the pledgor and the proceeds applied upon the debt, and still later he transferred them to a third party, and they have come to the hands of the plaintiff for value. It is not claimed that the plaintiff occupies any other or different position than Brooks would if he had brought the action upon the notes at maturity. Bruen, the payee of the notes, was the private secretary of Frost, the president, and the notes were made payable to him by Templeton, the secretary of defendant, who drew them in that form at the suggestion of the president. There is not and cannot be any dispute with respect to the authority of Frost to make the notes. They were made with sufficient authority, the fraud upon the defendant consisting in the wrongful use of them when made for a legitimate purpose by the president for his own private business.

Nor is there any dispute with respect to the fact appearing on the plaintiff's case, that Brooks paid value for the notes and made present advances in cash to Frost in the sum already stated. It is equally clear upon the record that Brooks had no actual knowledge of the facts surrounding the origin of the paper or of the diversion of it by the president. He received the notes and made the advances in Boston, whereas they were made and the transactions stated with respect to them took place in a distant state, where the office of the company was, and is indicated on the paper as the place where made.

The learned trial judge held as matter of law that the plaintiff could not recover upon the notes for the reason that he was chargeable with knowledge of the facts and circumstances that rendered them invalid in the hands of Frost. The plaintiff is, doubtless, chargeable with such knowledge or notice as to the antecedent equities of the defendant as Brooks, his assignor, had, but with no others. If the notes

were valid obligations in the hands of Brooks the plaintiff may assert every right that he could have asserted. It needs no argument to show that if Brooks had knowledge or notice or is in law chargeable with knowledge or notice of the fraud by means of which the notes were diverted from the purpose for which they were authorized to be made, that the plaintiff cannot recover. But it is not claimed 'that he knew anything about the origin or diversion of the paper in fact. All that is claimed is that when it was presented to him in Boston by Frost, whom he knew to be the president of the railroad, there was enough upon the face of the paper to put him upon inquiry and, therefore, to charge him with knowledge of all the facts that such inquiry would have disclosed. He knew nothing, so far as appears, outside of the paper itself, except the fact that the party presenting it was defendants' president and that he was proposing to pledge the notes for his own debt, or rather for the debt of his firm, which for all the purposes of the question may be assumed to be the same thing. The question in the case is, therefore, reduced to a very narrow inquiry, and that is whether Brooks, standing in all other respects in the position and sustaining the character of a *bona fide* purchaser of negotiable paper, is deprived of that character and the benefits of that position by reason of anything appearing upon the face of the notes themselves.

The mind, at the threshold of the inquiry, encounters two principles that point in opposite directions and lead to different conclusions, as the one or the other is allowed to preponderate in the mental process of determining the legal rights of the parties. On the one hand is the principle which protects a *bona fide* holder of commercial paper from existing antecedent equities between the parties, and on the other the principle which protects a corporation from the unauthorized and fraudulent acts of its own officers. There is not much difficulty in stating the rule of law defining the duties and obligations of a party to whom negotiable paper is presented for discount or sale before due. He is not bound at his peril to be on the alert for circumstances which might possibly

excite the suspicion of wary vigilance ; he does not owe to the party who puts the paper afloat the duty of active inquiry in order to avert the imputation of bad faith. The rights of the holder are to be determined by the simple test of honesty and good faith, and not by a speculative issue as to his diligence or negligence. The holder's rights cannot be defeated without proof of actual notice of the defect in title or bad faith on his part evidenced by circumstances. Though he may have been negligent in taking the paper, and omitted precautions which a prudent man would have taken, nevertheless, unless he acted *mala fide*, his title, according to settled doctrine, will prevail. (*Magee* v. *Badger*, 34 N. Y. 249 ; *Am. Ex. Nat. Bk.* v. *N. Y. Belting, etc., Co.*, 148 N. Y. 705 ; *Knox* v. *Eden Musee Am. Co.*, 148 N. Y. 454 ; *Canajoharie Nat. Bk.* v. *Diefendorf*, 123 N. Y. 202 ; *Vosburgh* v. *Diefendorf*, 119 N. Y. 357 ; *Jarvis* v. *Manhattan Beach Co.*, 148 N. Y. 652.)

Applying these rules to the conceded facts of the case, it seems to me to be impossible to impute bad faith to Brooks in the transaction. He advanced a large sum of money on the faith of the paper, without any actual knowledge that the relations of the party with whom he dealt to the paper were different from what they appeared to be on the face of it. The question now is, not what the facts were, but what they appeared to be, and what he had the right, from the notes themselves, to assume. He had the right to assume that the relations to the paper of every party whose name appeared on it were precisely what they appeared to be. (*Hoge* v. *Lansing*, 35 N. Y. 136.) He had the right to believe that the notes had been issued by the defendant to Bruen for value in the regular course of business, and were by him transferred to Frost & Son in like manner. · There was nothing to suggest to him that Frost was dealing with paper that belonged to the railroad for his own benefit. The appearances were that the defendant had put the notes in circulation by delivery to Bruen, and that they came to Frost's firm in the regular course of business for value and were then the property of

the firm. It is quite true that all these appearances were deceptive and that the actual facts were otherwise. But how was a banker or business man in Boston to know or suspect that Bruen was only the nominal payee and a mere instrument in the transaction to enable the president to divert the paper to his own use. The name of the party who presented it and had it in his possession appeared on the face of the paper to have signed it as president. The name of another officer of the corporation was upon it also, attesting its regularity, and everything was in his handwriting except the signature of the president and the indorsement of the payee. So far as Brooks was concerned, the paper showed that it had been issued to a stranger in the regular course of business, and, through his indorsement, had come to the hands of a mercantile firm of which the president of the corporation was a member. If this were the fact, there is no doubt as to his right to use it in the business of the firm. The holder of a note who has no actual knowledge or notice of a defect in the title, or other equities between the parties, when circumstances come to his knowledge sufficient to put him upon inquiry, is chargeable with knowledge of all the facts that such inquiry would have revealed. The difficulty in this case is to find the circumstance which can be said to be sufficient to put Brooks upon the inquiry. There was absolutely nothing on the face of the paper except the signature, as president, of the party who was dealing with it, and that, we think, was not sufficient in view of the fact that the appearances were that he was a purchaser from a third party.

The principle that applies in a case where an officer of a corporation makes the corporate obligation payable to himself, and then attempts to deal with it for his own benefit, does not aid in solving the question in this case. When paper of that character is presented by the officer or agent of the corporation, it bears upon its face sufficient notice of the incapacity of the officer or agent to issue it. (*Hanover Bank* v. *Am. Dock & T. Co.*, 148 N. Y. 612; *Bank of N. Y., etc.*, v. *Am. Dock & T. Co.*, 143 N. Y. 559; *Wilson* v. *M. E. R. Co.*, 120 N. Y.

145; *Gerona* v. *McCormick*, 130 N. Y. 261.) There are numerous cases that belong to that class cited by the learned counsel for the defendant on his brief. There is a manifest distinction between them and the case at bar. Here the officer was not dealing with the corporate notes payable to himself but with notes that had been regularly issued, so far as appeared from their face, to a stranger and by him transferred to a firm of which the officer was a member and for which he acted as agent in procuring the loan from Brooks and pledging them as security. The presence of Frost's name upon the paper, as one of the agents who issued it, was not naturally or reasonably calculated, under the circumstances, to arouse suspicion in the mind of Brooks, or to lead him to believe that the president was attempting to defraud the corporation in disposing of the notes. None of the cases cited by the learned counsel for the defendant sustain the proposition that such a circumstance is sufficient to put the purchaser of negotiable paper upon inquiry or charge him with knowledge of the fact in case he fails to make it, and there are many cases that tend to support the contrary view. (*Am. Ex. Nat. Bank* v. *N. Y. B. & P. Co.*, 148 N. Y. 698; *Miller* v. *Consolidation Bank*, 48 Penn. St. 514; *Walker* v. *Kee*, 14 S. C. 142.)

It is said that if the plaintiff's right to recover in this case is sanctioned by this court an easy way will be opened for the perpetration of frauds upon corporations by officers intrusted with its negotiable obligations, and that the device of making the paper payable to the order of a nominal payee, interested or aiding in the fraud, will be a favorite one to accomplish the end. We must leave all such cases to be dealt with upon the peculiar facts and circumstances as they arise. It is more reasonable and just to assume that corporations will be able to protect themselves by proper vigilance from the dishonesty of their own officers, than to impute to parties who have taken the paper for value, ignorant of its origin, constructive knowledge of the facts upon such circumstances as exist in this case.

We think that there was nothing on the face of the paper

or in the facts shown to warrant the court in holding as matter of law, as it did, that the obligations were received by Brooks and the advances made on them *mala fide*.   That is the effect of the ruling at the trial, and the conclusion was not supported by the facts.

It follows that the judgment must be reversed and a new trial granted, costs to abide the event.

BARTLETT, J. (dissenting).   The contest in this case arises over two notes for $5,000, constituting the first and second causes of action set forth in the amended complaint.

The plaintiff's exceptions were heard in the first instance at General Term, were overruled and as to these causes of action the complaint was dismissed.

The material facts to be considered on this appeal are undisputed.

On the 17th day of February, 1888, the board of directors of the defendant railroad company held a meeting and adopted the following resolution: "*Resolved*, that the president be and he is hereby authorized to make a contract for the purchase of fifty flat cars for the use of this company, and is authorized in carrying out this purpose, to give the notes of this company to the sum of 'ten thousand dollars."

M. S. Frost, the president of the company, on the day the resolution was passed, asked the secretary to prepare the notes in blank, and upon objection being made suggested they be payable to Mr. Bruen, his private secretary, stating that when he wished to negotiate the notes Bruen could indorse them.

It is admitted that the president of the company fraudulently appropriated these notes to his own use, and that no part of the proceeds was used in procuring cars under the resolution, or for the benefit of the company in any way.

The disposition made of these notes by Frost, the president of the defendant, is set forth in the testimony of Francis A. Brooks, of Boston, the alleged holder in good faith.   He states : " I had business transactions with Mr. Frost   *   *   * on the nineteenth day of March, 1888 ; I took of him the

note of M. S. Frost & Son for $30,000. * * * He then applied to me for a loan of $30,000, and I made such loan and took the note of M. S. Frost & Son of him for that amount.

" I received of him as collateral security for said note of $30,000 certificates or receipts representing bonds of the Pittsburgh, Shenango & Lake Erie Railroad Company, deposited with a certain trust company or companies of a par value of $21,000. Also two notes of $5,000 each of the Pittsburgh, Shenango & Lake Erie Railroad Company, dated February 24th, 1888, one payable on three months' time and one payable on four months' time."

Brooks also testifies he did not become the absolute owner of the notes until long after they were due, and that in the October or November before he swore to his deposition in this action he transferred them.

At the time the notes fell due they were not presented to the company for payment.

The two notes were in the following form, except one was for three months and the other four months:

" $5,000.              GREENVILLE, PA., *Feb'y* 24, 1888.

" Three months after date, the Pittsburgh, Shenango and Lake Erie Railroad Company promises to pay to the order of John T. Bruen, five thousand dollars at the American Exchange National Bank, New York City.

"THE PITTSBURGH, SHENANGO AND
        LAKE ERIE RAILROAD COMPANY,·

" Value received.                    By M. S. FROST,

" Attest :                              *President.*

        " E. S. TEMPLETON,
                " *Secretary.*"

One note was indorsed :
        " JOHN T. BRUEN."
        " M. S. FROST & SON."

The other was indorsed :
        " Pay to the order of M. S. FROST & SON."
                        " JOHN T. BRUEN."
                        " M. S. FROST & SON."

It is not claimed that Bruen, the private secretary of Frost and the payee of these notes, had any interest whatever in them. One note was indorsed by him to M. S. Frost & Son and the other in blank. It is not claimed that this transfer was for value. The one question is whether Brooks was the *bona fide* holder of the notes for value, in the usual course of business, before maturity, and without notice of facts affecting their validity, it not appearing that he had knowledge of the fraudulent acts of Frost in diverting the paper of the corporation to his own use, although he did know that Frost was president of defendant and was using these notes for his own purposes. In other words, was there enough upon the face of this negotiable paper and the transaction in which he took it as collateral security for the loan he then made not only to have put Brooks as a prudent man upon inquiry, but to enable the court to say as matter of law, on undisputed facts, that he acted *mala fide* in not requiring Frost to disclose his authority to transfer his company's notes as collateral in his own business? Counsel do not agree as to whether the evidence shows that the loan was made to Frost or to his firm. Brooks' testimony may be read either way possibly; at all events it does not seem perfectly clear, but I do not regard it as important. Frost was borrowing this money and using the notes of his company for his own purposes, either as an individual or for his firm.

Although a partnership is to be regarded as a legal entity for certain purposes, this fiction may not be invoked to shield one of the co-partners, or to enable him to do as a partner that which the law prohibits him from doing as an individual. (*Jones* v. *Blun*, 145 N. Y. 333.)

It is the contention of the learned counsel for the appellant that when these notes were offered to Brooks as collateral security they were not, upon their face, corporate obligations created by Frost in his own favor, but rather a corporate obligation issued regularly for value to a stranger, John T. Bruen, and indorsed by him for value to M. S. Frost & Son, who were then the ostensible owners.

I do not think upon the face of the notes and the transaction of loan there was enough to warrant Brooks in assuming that M. S. Frost & Son were the ostensible holders for value from a stranger.

In the loan transaction Frost gave Brooks, as collateral, only securities of the company of which he was president, and as to the notes in controversy the original payee indorsed direct to Frost's firm.

If this simple device is to serve the purposes of dishonest officers of corporations who desire to realize upon corporate paper of their own fraudulent creation then the way is open to them for unrestricted plunder.

A president of a corporation executes its note, fills in as payee the name of his office boy, and upon securing the latter's indorsement to his firm is possessed of paper issued regularly for value to a stranger and duly indorsed; any one in the commercial world is then at liberty to discount the note without fear of legal consequences.

The fact that Frost was in the possession of the notes of the defendant indorsed to him by the original payee, which he had executed as its president and proposed to use for his own purposes was enough to put Brooks upon inquiry, and failing to do so he acted *mala fide*. This is a safe rule and any other would be fraught with the greatest danger to corporations.

It is, of course, quite possible that the president, or other officer of a corporation, may be lawfully in possession of its commercial paper, executed by himself and entitled to use it in his own business, but there is no hardship in a rule requiring the proposed purchaser to ascertain the fact.

There is no peril to the general business public in such a rule, as the fact that the officer of a corporation desires to use its paper, signed by himself, in his private business, is an unusual circumstance and naturally suggests inquiry.

In the case at bar if inquiry had been made of the secretary of the company an immediate disclosure of the proposed fraud upon the defendant would have resulted.

This rule invokes no new principle and is in harmony with the law for the protection of the *bona fide* purchaser for value as expounded in this country for many years. In *Magee* v. *Badger* (34 N. Y. 249) this court, in referring to the rights of the *bona fide* holder of commercial paper, said: "He is not bound, at his peril, to be upon the alert for circumstances which might possibly excite the suspicions of wary vigilance. He does not owe to the party who puts negotiable paper afloat, the duty of active inquiry, to avert the imputation of bad faith. The rights of the holder are to be determined by the simple test of honesty and good faith, and not by a speculative issue as to his diligence or negligence."

This is a clear statement of the rule of law, and its application to the facts in the case at bar defeats recovery.

The rule was restated by this court very recently as follows: "In all cases, where it is sought to defeat the right of the holder of negotiable paper before maturity to recover against the maker, it is essential that actual notice be proved of the defect in title, or that circumstances be shown evidencing bad faith in the holder and creating reasonable grounds for suspecting his conduct in the transaction." (*Am. Ex. Nat. Bank* v. *N. Y. Belting, etc., Co.*, 148 N. Y. 705.)

Also in *Knox* v. *Eden Musee Americain Company* (148 N. Y. 454) the rule is thus stated: "And the transferee, although he may have been negligent in taking it, and omitted precautions which a prudent man would have taken, nevertheless, unless he acted *mala fide*, his title, according to the doctrine now settled, will prevail."

In *Canajoharie Nat. Bk.* v. *Diefendorf* (123 N. Y. 202) this court said in regard to the rights of the holder of commercial paper: "What constitutes good faith in such transactions has been the subject of frequent discussion in the books, and while differences of opinion may exist on some points, there is perfect uniformity among them upon the point that a want of good faith in the transaction is fatal to the title of the holder. * * * The requirement of good faith is

10

expressed in the very term by which a holder is protected and is fundamental in the maintenance of that character."

The Supreme Court of the United States, in *Murray* v. *Lardner* (2 Wall. 121), said : " The rule may be said to resolve itself into a question of honesty or dishonesty, for guilty knowledge or willful ignorance alike involve the result of bad faith."

The burden of establishing good faith is upon the plaintiff, and when the presumption in his favor is rebutted by defendant's proofs then he must show affirmatively his good faith. In this case the plaintiff rests upon the face of the notes and the undisputed facts of the transaction in which they were taken as collateral security, thus making the existence of good faith a question of law.    There was no question for the jury.

These facts bring Frost, the agent of the defendant, and Brooks, the money lender, together, with full knowledge in Brooks that Frost was the president of the defendant and proposing to use the corporate notes he had executed, for his own purposes, his title being derived from the original payee.

The counsel for appellant, in an ingenious and able argument, starts out with the proposition that Frost was an agent for two principals, one the defendant corporation, and the other the firm of M. S. Frost & Son, thus making the situation like that of a partnership note made to the order of a stranger and indorsed by him, and subsequently indorsed and negotiated by another partnership, the person who negotiated the note for the indorsee firm being a member of each partnership. He cites two cases in this connection which he insists should be decisive of this appeal, viz. : *Miller* v. *Consolidation Bank* (48 Penn. St. 514) and *Walker* v. *Kee* (14 South Carolina, 142).

I have already pointed out that Frost could not shield himself behind his firm.    Both he and Brooks must meet this transaction as if the notes were indorsed by the original payee to Frost personally.

Even if it be assumed that Frost stood in the attitude of double agency, as suggested, it would not render applicable the principle laid down in the cases cited, as Frost's position as

president of the defendant corporation and member of the firm of M. S. Frost & Son would not confer upon him the power to negotiate corporate paper precisely as if the corporation were another firm in which he was a partner.

*Miller* v. *Consolidation Bank* (48 Penn. St. 514), just cited, was a case where a partner in two firms drew the note of one firm, indorsed it to the other firm, discounted it at the Consolidation Bank, passed the proceeds of the discount to indorsee firm and subsequently drew them out and converted them to his own use.

The court held under these circumstances the bank properly discounted the paper.    Agnew, J., said: "One who is a member of several firms has presumptively the same power in each that his partners have.    To say that he cannot draw and indorse the same paper as the representative of different firms is simply to negative his power to act in the second firm because he has acted in the first.    Having in each the power of a partner presumptively as to the public, and acting in that apparent right, it is no ground of suspicion that his indorsement of the name of one firm is in bad faith to the other as makers of the note.

"But here there is nothing out of the usual course of business and nothing in the face of the paper to indicate that the note was not drawn by the firm of Miller & Persch in their usual course of business in a partnership transaction with Persch & Steele."

No argument is necessary to show that this case, and the one cited with it, have no application to the case at bar, and the same may be said of a large number of authorities on the brief of appellant involving a similar principle.    In the case at bar the transaction was entirely out of the usual course of business, and the presumption was that the proposed use of the corporate paper was irregular.

This court, in the Second Division, in *Wilson* v. *Metropolitan Elevated Ry. Co.* (120 N. Y. 145), recognized the principle we are now discussing, although holding it did not defeat the recovery in that case for the reason that the pur-

chaser of a promissory note, purporting to have been issued by a corporation, who makes the purchase under circumstances which devolve upon him the duty of inquiry as to its validity, assumes no greater risk, by his failure to make inquiry, than the burden of proving that the facts he could have discovered, had he made inquiry, would have protected him. In the case cited the note was drawn by the defendant's president, payable to the order of the corporation, and indorsed by him as president and individually.

It was conceded that the president was using the note for his individual benefit, to the knowledge of plaintiff, but as it appeared that an inquiry would have disclosed a state of facts showing the president was authorized to so use it the defendant was liable.

This court, in disposing of the case, said (p. 150):

" Undoubtedly the general rule is that one who receives from an officer of a corporation the notes or securities of such corporation, in payment of, or as security for, a personal debt of such officer, does so at his own peril. *Prima facie* the act is unlawful, and, unless actually authorized, the purchaser will be deemed to have taken them with notice of the rights of the corporation."

The learned counsel for the respondent submitted an able brief, with an exhaustive reference, to the authorities in support of the recovery below, but I deem any further discussion of the cases as unnecessary. I have already suggested that there is no doubt as to the rule applicable to the *bona fide* holder for value of commercial paper ; it is too well settled to admit of serious debate at this late day, and the only question here is whether it can be said, under the admitted facts, that Brooks was put upon his inquiry, and failing to follow it up, is chargeable with bad faith. I think, as already stated, that this question must be answered in the affirmative.

The judgment appealed from should be affirmed.

ANDREWS, Ch. J., GRAY and MARTIN, JJ., concur with O'BRIEN, J.; HAIGHT and VANN, JJ., concur with BARTLETT, J.

Judgment reversed.