**In re NEW YORK CAR WHEEL WORKS.**

(District Court, W. D. New York.   January 30, 1905.)

No. 1,570.

BANKRUPTCY—PROVABLE CLAIMS—VALIDITY OF NOTES OF CORPORATION.

Notes executed by a bankrupt corporation to the claimant for the amount of a sight draft which had been drawn by another corporation on the bankrupt and cashed by the claimant, but which had not been accepted, *held* to have been based on a valuable consideration, and to be valid against the bankrupt estate, where it appeared that the drafts were drawn in renewal of others which the bankrupt had accepted, and cashed by the claimant in accordance with a long-established custom, from which it had a right to infer that they represented an indebtedness of the bankrupt, and also that, on the execution of the notes, claimant surrendered to the bankrupt valuable collateral, which later passed to its trustee.

In Bankruptcy.   On question certified by referee.

Opinion of William H. Hotchkiss, referee, on motion to expunge the claim of the North American Trust Company, and to compel restitution of the first dividend previously paid:

The claim of the North American Trust Company was on November 4, 1903, duly allowed at $94,198.50.   Later a dividend of 10% was paid the claimant. Later, after a second dividend had been declared, but before it was paid, this motion was made; it taking the form of a petition filed March 4, 1904.   Payment of the second dividend was thereupon withheld, and the controversy proceeded with.   The claim rests on three promissory notes uttered by the bankrupt corporation, all dated June 23, 1902—the first for $25,917.64, the second for $25,917.64, and the third for $77,752.93; the first and second showing credit indorsements of $17,482.36 and $25,917.64, respectively.   At the time of its allowance the security held to such notes was estimated as worthless.

The present motion, which is made by the trustee on information not in his possession at the time of the allowance, rests on the contentions that the notes do not represent money loaned by the claimant to the bankrupt, but an indebtedness of the P. H. Griffin Machine Works (a trade-name of P. H. Griffin, the president of the bankrupt) assumed by the bankrupt.   In brief, the trustee challenges the consideration and alleges ultra vires.   From these simple propositions the trustee has, as the record will show, wandered rather far afield. The breadth of his inquiry and the liberality allowed in the matter of evidence suggest that the facts bearing on this issue be now clearly, and, if possible, briefly, stated.   In no other way may the fog which seems to have settled over counsel and court be lifted.

First, the maze of corporations whose names fairly punctuate this record. The New York Car Wheel Works is the bankrupt, and will hereafter be termed the "bankrupt."   The North American Trust Company is the claimant, and will be termed the "trust company" or the "claimant."   The Niagara Bank of Buffalo will be termed the "state bank."   The City National Bank of Buffalo will be termed the "national bank."   The International Car Wheel Company will be termed the "holding company."   The Boston Car Wheel Company, the Manistique Iron Company, the Canada Iron Furnace Company, and the St. Thomas Car Wheel Company, which were companies allied to the bankrupt, will be termed the "——— company."   Besides, the trustee in bankruptcy, who is also the receiver of the national bank, will be termed the "receiver," and the P. H. Griffin Machine Works, already referred to, will be termed the "machine company."

Second, it is essential to find the exact status of the parties on June 29, 1901; this date being selected because concededly the failure of the national bank on that day was the first step in a series of transactions relied on by the trustee to establish his position.   On that day the New York Car Wheel Works was a going concern—a corporation which had been for some time exclusively managed by its president, Mr. Griffin, and, so far as this record

shows, able to meet its obligations as they matured. Likewise the trust company, the national bank, and the state bank were doing a regular banking business—the first at New York, and the others at Buffalo. So, also, Mr. Griffin was doing business in the regular way, though using the machine company as a trade-name, without, so far as appears, any question as to his solvency. It seems to be sufficiently established that it was the course of business of the machine company to draw largely on the bankrupt at its London office, and sell such drafts to the trust company through either the national or the state bank, and that, as between the present bankrupt and the claimant trust company, such practice had become a business custom. This custom seems to have included the selling in the same way of more drafts with which to pay the previous drafts on presentation in London. That the drafts were thus met with the proceeds of new drafts was admittedly known to the claimant, though it asserts that this was that it might have two names on its paper. It appears also that the custom involved the acceptance of the drafts by the bankrupt in London, and that all drafts purchased by the claimant prior to June 29, 1901, except those in transit, had been so accepted. The failure of the national bank, followed almost immediately by that of the state bank, destroyed the credit equilibrium necessary to a transaction of this character, and the drafts bought by the claimant and then in transit, aggregating in American money something over $149,000, were not accepted by the bankrupt when presented at its London office, and, as produced in evidence, show no acceptance since. It does not appear as clearly as might be wished to whose credit the moneys advanced by the claimant were placed on its books, but there is enough in the case to warrant a finding that it went to the credit of the machine works—i. e., to Mr. Griffin individually—rather than to the present bankrupt. No other obligation of the bankrupt to the claimant appears to have existed at that time. It seems to follow, therefore, that on June 29, 1901, the machine works, and not the bankrupt, was the actual debtor, and that all the claimant then had against the bankrupt was a cause of action, asserted by the trustee to be of more than doubtful validity, to compel an acceptance of the drafts in transit, on which payment was subsequently refused. But the claimant then held as collateral certain shares of the stock of the Manistique, the Canada, and the St. Thomas Companies, as well as a large block of the stock of the bankrupt, pledged by Mr. Griffin, and later acquired 1,000 shares of the stock of the Boston Company, all of which shares it held when the bankrupt gave the notes, the renewals of which now constitute its claim. There is some confusion in the record as to the ownership of the Manistique, Canada, St. Thomas, and New York stocks, so held as collateral, but they appear to have been the property of Mr. Griffin.

The transaction whereby the claimant acquired the Boston stock is vigorously challenged by the trustee; he asserting that such stock belonged to the bankrupt, and was transferred to the claimant in cancellation of a past-due indebtedness of the machine company, and that such transfer is therefore now voidable at the instance of the bankrupt's creditors whom he represents. This, indeed, is a case within the main case. For, if the claimant's cause of action to compel acceptance by the bankrupt in London was not a sufficient consideration for the giving of the bankrupt's notes, it might be doubted whether the surrender to it of the stocks, other than the Boston stock, was a consideration adequate to sustain the claimant's position here. The Boston Company's stock was issued to the bankrupt, and seems (though there is not enough in the record to warrant a definite finding) to have been its property. Mr. Griffin, its president, some time after the failure of the two banks, and before December 23, 1901, delivered this stock, indorsed by the present bankrupt in blank, to the claimant. There is nothing in the record to show whether or not he did it as president of the bankrupt, or as president of the state bank; if so, whether or not he had authority so to do, or whether it did it merely as an individual apparently owning it. It was so delivered in exchange for a release by the claimant of the liability of the machine company as drawer, and of the state bank as indorser, of four or five of the drafts previously mentioned.

Such, then, were the relations of the parties on December 23, 1901, when the bankrupt issued five notes to the claimant, the renewals of which, less

credits, are the substance of the proof of debt here, and received in return the various stocks, including the Boston stock referred to above, and the drafts sold through the state bank, previously mentioned.

On this state of facts I intimated to counsel at an earlier stage of this hearing that the petition to expunge should be denied. Later the case was opened, and more evidence taken. It adds little to the facts necessary to determine this controversy. Had a jury been present, much of it would necessarily have been excluded. However, that the whole record may go to the judge for review, all of it not excluded in rulings at the end of this memorandum is received. The more important facts brought out by this supplementary evidence have to do with the disposition of the stocks turned over to the bankrupt by the claimant. This was in pursuance of an arrangement in which the great bulk of the bankrupt's then creditors joined, for the purpose of preventing an immediate winding up of the bankrupt's affairs, and to give it opportunity to pay its debts from its earnings. Some stress is laid on the fact that the claimant then received $250,000 of the collateral bonds on a $149,000 debt, while other creditors received but dollar for dollar. But I fail to discover how that tends to establish either want of consideration in the notes themselves, or an ultra vires act on the part of the corporation issuing them. Such evidence has therefore been stricken out. The 20% payment on the bonds was made up largely of $100,000 realized from the sale of the Boston stock. The other stocks turned over by the claimant to the bankrupt, and by the latter to the holding company, were relatively of little value. The evidence is not sufficiently accurate to warrant the giving of any exact amount. Other pertinent facts will be stated in the discussion of the legal proposition involved.

The law bearing on this case has been exhaustively and ably briefed, and little independent investigation has been necessary. I confess to have been much shaken in my earlier belief that this petition should be denied by the brief of the trustee's attorney. Further investigation, however, seems to confirm the first impression.

Reduced to a narrow compass, the trustee claims: (1) that the transfer of the Boston stock was an ultra vires act by the bankrupt's president, and is therefore void as to the claimant; (2) that, this being so, there was not an adequate consideration passing between the claimant and the bankrupt for the notes of December 23, 1901; (3) and, as a branch of this latter contention, that the acceptance of the London drafts by the bankrupt was also ultra vires, and therefore void; (4) also that the issue of the notes of December 23, 1901, was an ultra vires act on the part of the bankrupt, and the same are therefore void in the hands of the claimant. It is difficult to discuss these four propositions singly, each overlapping or including the other. So far as may be, however, this will be done.

(1) What right, asks the trustee, had Mr. Griffin, as president of the corporation, to use its property to secure a release of his own obligation and that of a bank in which he was interested? Doubtless, if the stock was the property of the bankrupt, his act was ultra vires as to the bankrupt. On the other hand, there is nothing in this record to charge the claimant with either knowledge or notice that such was the fact. Undoubtedly, as held in Wilson v. Met. Elev. R. Co., 120 N. Y. 145, 24 N. E. 384, 17 Am. St. Rep 625, a person receiving from an officer of a corporation securities of that corporation is presumed to have received such securities with knowledge of the rights of the corporation. But all that the record shows is that the certificate was issued to the bankrupt corporation. On the other hand, it appears that it was regularly indorsed in blank by such corporation; and there being nothing to show whether the indorsement was in the handwriting of Mr. Griffin or another, under seal or by stamp, how it was made or by whom it was made, in the absence of such proof the presumption is the other way, namely, that the indorsement was authorized by the officers of the corporation, and for its benefit and advantage. Rider, etc., Co. v. Roach, 97 N. Y. 378. If so, the claimant was warranted in treating it as Mr. Griffin's stock, and dealing with him accordingly. The claimant lays much stress upon Cheever v. Pittsburgh, etc., R. Co., 150 N. Y. 59, 44 N. E. 701, 34 L. R. A. 69, 55 Am. St. Rep. 646—a case which well illustrates how the minds of different men look

upon an issue such as that now at bar, the Court of Appeals there dividing four to three. The majority opinion holds, in substance, that where a promissory note is issued by a corporation, being drawn and attested by its secretary and signed by its president, and, after being regularly indorsed by its payee, is negotiated for value to a third party by a partnership of which the corporation's president is the acting member, these facts are not sufficient to put such third party on inquiry, and make it bad faith on his part to purchase the note. Though the property here transferred was but a quasi negotiable, the rule is doubtless the same. Daniels on Negotiable Instruments (4th Ed.) § 1708g. So far as it is in point, therefore, this case supports the claimant rather than the trustee. But the facts in this record differ materially from those in the Cheever Case. Here the third party had been dealing with the corporation's president in both his representative and individual capacity for years. It knew him to be the executive head of a number of large industrial enterprises. It had already received from him stock apparently his own as collateral to his and the bankrupt's obligations. As president of the state bank, he was vitally interested in reducing its contingent liabilities. At this time the claimant also must have known that Mr. Griffin was largely interested in the Boston Company. He presented a certificate of that company's stock, regularly indorsed. These in the centers of finance pass from hand to hand with almost as great facility as bank notes—this on the presumption that possession and indorsement in blank evidence ownership. In these facts the claimant had the right to believe that it was Mr. Griffin's stock. While in considerable doubt, therefore, I am constrained to hold that there is not enough in this record to warrant the conclusion that the claimant acted in bad faith, in that it was' put on inquiry. Another might easily reach the opposite conclusion. See dissenting opinion in Cheever v. Pittsburgh, etc., R. Co., supra. My decision, therefore, is intended to go no further than "Not proven," which, in courts, whatever be the effect of inferences or suspicions on the conclusions of individuals, must always result in the judgment, "Not so." The claimant also asserts that, even if it should be held that it knew or was put on inquiry that the Boston stock was the property of the bankrupt, the transaction, though thus ultra vires, is now closed, and the bankrupt, having clearly benefited thereby, should not now be heard to assert want of authority, and, still, further, that the door is shut to this plea by the bankrupt's subsequent ratification of its president's act. These points need not now, however, be discussed.

(2) If the conclusion just announced is correct, the trustee's second contention is also unsound. The Boston stock was valuable, netting ·$100,000 on a sale shortly after being acquired by the bankrupt. If the claimant had a good title to this stock, it, in turning such stock over to the bankrupt with other stocks of more or less value besides, surely gave adequate consideration for the notes now at issue. Of this there can be no question, and the vigorous attack made on the Boston stock transaction serves to indicate that this is also the trustee's view. Further, I am not satisfied that the claimant has failed to show other valuable considerations for these notes. As a part of the transaction, it engaged to give and did give its services in securing the consents of creditors in large aggregate amount to the extension agreement then accomplished, and its officers agreed to become and became members of the bankrupt's board of directors during a large administration of affairs by its creditors. Whether or not there was consideration in the waiver of its claim to compel the acceptance of the London drafts, need not be here decided. It is suggested, however, that the surrender of a doubtful claim, provided it is colorable, is a sufficient consideration for a new promise. White v. Hoyt, 73 N. Y. 505; Zoebisch v. Von Minden, 120 N. Y. 406, 24 N. E. 795.

(3) The third contention of the trustee must also fail, at least as far as this controversy goes. Clearly the acceptance of the London drafts was for the accommodation of the machine company. It follows on settled principles that, as between the machine company and other parties chargeable with knowledge or notice, such acceptance was ultra vires and void. Cook on Corporations (5th Ed.) § 774. But this is not an action in which the present claimant seeks to compel the bankrupt to accept the drafts, and thus fix the liability it refused to recognize in July, 1901. The point is made only as an incident to

the main contention, that there was no consideration for the notes of December, 1901. Having already found that there was consideration, further discussion of this point is unnecessary.

(4) The other contention of the trustee may be quickly disposed of. Even conceding consideration, the notes of December 23, 1901, if not intra vires as to the payee, which still holds them, must fail. The trustee claims that the transaction was out of the ordinary course of business. The present bankrupt was insolvent, on the verge of bankruptcy, and known to be such by the claimant. While in that condition it issued to the claimant notes for over $149,000. These notes, it is asserted, were executed and delivered without action thereon by the stockholders or even the directors of the corporation. Thus the corporation created a large apparent indebtedness, as is claimed, on the sole authority of its president, assisted by another officer acting under his direction. But even so, what followed? The consideration given was immediately transferred by the bankrupt to the holding company, and by it mortgaged or pledged to the present claimant as trustee, and later from time to time sold, and the money realized therefrom paid to the bankrupt's creditors. As a result, immediate bankruptcy was avoided, and the corporation continued in active business for nearly two years. What it wanted was a chance to recover its fortunes. It is apparent that, as the circumstances then were, this chance could only be won by securing possession of the Boston stock. Even granting that the bankrupt might have recovered this stock after action was brought, what would such recovery have availed? The corporation would have been in bankruptcy years before final judgment. Will such corporation now be heard to assert that the issue of these notes was unauthorized? The contract is executed, not executory. There was no bad faith on the part of the payee of the notes. The bankrupt reaped the benefits of the arrangement. Woodruff v. Erie Ry. Co., 93 N. Y. 609; Linkhauf v. Lombard, 137 N. Y. 417, 33 N. E. 472, 20 L. R. A. 48, 33 Am. St. Rep. 743. It makes no difference that the chance thus gained did not have a successful issue. The corporation and the trustee representing it are therefore now estopped to set up ultra vires. So, it seems to me, is the trustee as the representative of creditors. It is elementary that he stands in no better position than they did. But creditors postdating December 23, 1901, would have no standing in an action on these notes. Earlier creditors, so far as this record shows, have either all been paid in full, or were parties to the extension agreement. The latter have received, largely from the avails of the Boston stock, 20% of their claims. To be sure, it does not appear that they had notice that the Boston stock was the property of their debtor. On the whole case, however, I do not believe they could overcome a plea of estoppel, were the issue between them and the claimant in another court. The trustee, as their representative, is therefore also estopped. Further, under the rule of Rider Life Raft Co. v. Roach, 97 N. Y. 378, it may be suggested that it was incumbent on the trustee to show affirmatively that the issue of the notes was without the authority of the corporation. This he has not done. So far as this record goes, they were therefore not ultra vires.

The claimant also asserts the well-settled rule that, where a party seeks to rescind a contract, it must offer to restore the other party to its position before the contract was made. I do not understand, however, that there is any issue of actual fraud here. This is not a case founded on rescission. Surely it would be unjust to permit one party to an ultra vires contract to defeat an action based on that informity by proof that the other party could not restore him to the position he occupied before. The numerous authorities on rescission cited by the claimant are not, therefore, in point.

On the whole case, therefore, I hold with the claimant. It may be that all the facts, if capable of proof, would warrant the rather sweeping inferences and conclusions stated in the trustee's brief. They are not proven—perhaps are beyond his reach. The difficulty with which he and his counsel have labored is one of time. Two years have elapsed since the transactions he complains of. Evidence then available may be scattered. Rights then existing may have been lost by neglect. If, as he claims, the bankrupt's president converted the Boston stock to his own use, the trustee has his remedy elsewhere. The issue here is simply as to the validity of these notes. For the

reasons stated, I think that validity established. The trustee will therefore pay the second dividend to the claimant, together with such interest on the amount ($9,419.85) as it has earned in the depository since the date of declaration.

From what goes before it will be seen that in reaching this conclusion only the following evidence received tentatively has been excluded: (a) The testimony of the witnesses Wedder, Burnet, and Perkins, by deposition taken in New York, so far as the same relates to what was done with the stock given by the claimant for the notes after the same were delivered to the bankrupt; thus sustaining the claimant's objection on page 3 of proceedings on July 8, 1904, with an exception to the trustee. (b) The testimony of the same witnesses as to what was received for such stocks when they were subsequently disposed of by the holding company, except so far as such testimony tends to establish their value; thus sustaining, in part, the claimant's objection on the same page, with exception to both the claimant and the trustee. (c) The testimony of the witness Vedder in the same deposition as to whether any of such stocks came into his hands as treasurer; thus sustaining the claimant's objection, with exception to the trustee. (d) The testimony of the witness Aldrich as to the transaction whereby he, as receiver, disposed of certain stock of the Manistique Company, save so far as such testimony tends to establish its value; thus in part sustaining the claimant's objection on pages 3 and 4 of the proceedings of July 6, 1904, with exception to both the claimant and the trustee. (e) The testimony of the witness Aldrich as to the claimant receiving more than dollar for dollar of the holding company's bonds, thus sustaining the claimant's objection on page 7 of the proceedings of July 6, 1904, with exception to the trustee. (f) The testimony of any other witnesses, or of these witnesses elsewhere in the record, to the effect indicated in "a," "b," "c," "d," and "e," above, if duly objected to, with, in that event, exception to the party against whom the ruling is given.

Fred D. Corey, for trustee.
Cox, Kernan & Kimball, for claimant.

HAZEL, District Judge. The facts are sufficiently set forth in the opinion of the referee in bankruptcy, and I concur in the conclusions therein stated. Mr. Burnett, witness for claimant, substantially testified at the hearing that the sight drafts which were subsequently secured by the transfers of stock in the Boston Car Wheel Company, and evidenced by the promissory notes upon which the claim herein is based, were given in renewal of previous bills of exchange drawn in the same manner. Prior bills of exchange had been accepted by the bankrupt in London, and, according to the proofs, were received or discounted by the claimant in the ordinary course of business dealings. It had become a custom in the course of dealings between the North American Trust Company and the P. H. Griffin Machine Works for a number of years to draw on the bankrupt at its London office. The bills of exchange drawn in the manner indicated by the proofs were sight drafts in renewal of the original drafts. In the circumstances presented, which are mentioned more in detail in the opinion of the referee, it is difficult to conceive of any substantial reason why the trust company should have been suspicious when the original bills of exchange were drawn. True, a party to whom negotiable paper is presented for discount or sale before maturity by an officer of a corporation is bound to exercise caution and circumspection in order to escape the charge of bad faith when a defect in his title is urged. Cheever v. Pittsburgh Railway Co., 150 N. Y. 59, 44 N. E.

701, 34 L. R. A. 69, 55 Am. St. Rep. 646. The title of the trust company, however, in the sight drafts, in view of the unchallenged original transactions, is not subject to attack unless it acted in bad faith. The mere negligent acceptance or purchase of the bills of exchange does not impute to the claimant a presumptive knowledge of any unlawful diversion of the proceeds by Mr. Griffin. The situation of the parties at the beginning of their relations was such that the trust company could rightfully presume that the drafts were drawn on the bankrupt pursuant to bona fide transactions existing between the drawer and drawee. The subsequent arrangements to secure the payment of the indebtedness are wholly dependent upon the original transaction, and upon a course of business dealing which the parties themselves adopted prior to the purchase of the sight drafts in question. Nothing occurred before the failures of the City National Bank and the Niagara Bank to put the claimant upon inquiry. There were no suspicious circumstances attached to the initial transaction to warrant the claimant in refusing the renewal drafts which evidently were a continuation of the original indebtedness. As the evidence falls short of showing the drafts in the beginning of the relations with the trust company to have been without consideration, it necessarily follows that the contention of the trustee that the transfer of the Boston stock was ultra vires must fail. Having concluded that, upon the main issues involved, the referee has correctly decided the questions submitted for review, a further discussion will not be necessary.

The question submitted, whether the claim of the North American Trust Company hitherto allowed by the referee should be expunged, is answered in the negative.