Spiegelberg, J.
This action is brought to recover the value of four United States Liberty bonds of $100 each. The bonds were stolen from the plaintiff by her fifteen-year-old' son Julius and sold by him to the defendants. The defendants are stock brokers in the city of New York and have established a department for buying and selling Liberty loan bonds. Juliu-s Morris called at the office of the defendants on December 3, December 7 and December 16, 1918, disposing on the first two dates o.f one bond each and on the third of two bonds. Upon entering the defendants’ office, he was shown to a window where a young girl handed him a card to fill out which contained blanks for his name, address, occupation and citizenship. He thereupon handed in the card and bonds and was shown to another window where he received the money.
This case is governed by section 95 of the Negotiable Instruments Law, which reads: “To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith.”
This provision puts in statutory form the rule of the common law. Arnd v. Aylesworth, 145 Iowa, 185; Ward v. City Trust Co., 117 App. Div. 130, 140. The question in this case is, did the defendants act in bad faith in purchasing the bonds in question? The term “ bad faith ” as used in the statute does not necessarily involve furtive motives (Ward v. City Trust Co., 192 N. Y. 61, 73); it means bad faith in a commer *741 cial sense. Rochester & Charlotte Turnpike Road Company v. Paviour, 164 N. Y. 281, 286.
If the conditions appearing in this case are typical of any considerable proportion of the yonth of this great city, it would be most distressing. The plaintiff is a hard-working woman, conducting a news-stand in this city. Her son Julius is a confirmed thief. At the time of the disposal of the bonds he was less than five feet tall, was very immature in appearance, was suffering from tuberculosis and bore upon his face the stamp of a degenerate, while at the same time he was endowed with natural alertness of mind. This unfortunate youth, after making inquiries how to dispose of his mother’s savings, was directed to the defendants. One of the young girls employed in the Liberty bond department asked him to fill out the card. It is very significant to show the lack of intelligence on the part of the young woman that when Julius omitted to fill out one of the lines in the card she, after inquiring of Julius, inserted that he he was in business for himself. It is difficult to understand, after seeing this poor wretched individual, how anybody with any degree of intelligence or possessed of ordinary caution would have believed that he was the owner of securities and conducting a newspaper business on his own account. The defendants took no precautions whatever against fraudulent transactions, except that they had a list of stolen bonds, and before the money was paid for the bonds, the numbers were compared. All comers were served without inquiry, with the result that the defendants did a very large business in Liberty bonds, exceeding for the month of December 20,000 transactions. It is common knowledge that many people of small means have acquired Liberty bonds. They have no facilities for properly .safeguarding these securities and of necessity have to keep them in their homes, where there is always danger of the bonds falling into the wrong hands. The man *742 ner in which the defendants conducted their Liberty loan department provided an easy way for thieves to dispose of their plunder. It is a case of “no questions asked. ” I do not for a moment wish to charge the defendants with the intention of extending an invitation to bond thefts. They are men of good reputation. I believe it is only necessary to call their attention to the lack of precautionary measures and that the proper remedy will be applied.
Upon the facts in this case I do not hesitate in arriving at the conclusion that the action of the defendants in buying the bonds amounted to bad faith within the authorities. The defendants were grossly negligent in purchasing the bonds. Although gross negligence does not of itself constitute bad faith as a matter of law, it is evidence from which bad faith may be inferred. Bipp v. Smith, 137 Wis. 234. In 8 C. J. 501, the rule is stated: “ Mere knowledge of the facts sufficient to put a prudent man on inquiry, without actual knowledge, or mere suspicion of an infirmity or defect of title, does not preclude a transferee from occupying the position of a holder in due course, unless the circumstances or suspicions are so cogent and obvious that to remain passive would amount to bad faith, but the existence of such facts may be evidence of bad faith sufficient to take the question to the jury.”
In the Paviour Case, supra, at page 284, the court says: ‘ ‘ While he was not bound to be on the watch for facts which would put a very cautious man on his guard, he was bound to act in good faith. (Second National Bank v. Weston, 161 N. Y. 520, 526; Cheever v. Pittsburgh, etc., R. R. Co., 150 N. Y. 59, 66). Even if his actual good faith is not questioned, if the facts known to him should have led him to inquire, and by inquiry he would have discovered the real situation, in a commercial sense he acted in bad faith and the law will withhold from him the protection that it would otherwise extend.”
*743 And at page 286: “ One who suspects, or ought to suspect, is bound to inquire, and the law presumes that he knows whatever proper inquiry would disclose. While the courts are careful to guard the interests of commerce by protecting the negotiation of commercial paper, they are also careful to guard against fraud by defeating titles taken in bad faith, or with knowledge, actual or imputed, which amounts to bad faith, when regarded from a commercial standpoint.”
In the Cheever case, cited in the Paviour Case, supra, it is said, at page 66: “ The rights of the holder are to be determined by the .simple test of honesty and good faith, and not by a speculative issue as to his diligence or negligence.”
Willful disregard of known facts showing want of title or willful evasion of knowledge of the facts amounts to bad faith. Matter of Hopper-Morgan Co., 156 Fed. Repr. 525. In that case the court says, at page 530: “ Circumstances may be such as to impose an active duty of inquiry and investigation, and if such duty is not performed it may be conclusive evidence of bad faith.”
Tested by the law applicable hereto, I hold that the defendants acquired the bonds in bad faith. Though they had no actual knowledge of the theft, the appearance of this immature, diseased and degenerate boy, claiming to be the owner of the bonds and in business for himself, was sufficient to deny his right to the bonds to the mind of any person with ordinary discrimination, or at least to thrust the duty upon the defendants to make further inquiries. They had no right to deliberately shut their eyes to obvious facts.
The plaintiff recovered from her boy’s loot the sum of $25, the rest having been spent in gambling and riotous living. The bonds brought $383.73. There is, accordingly, judgment for the plaintiff for the sum of $358.73.
Judgment for plaintiff.