Meridian Nat'l Bank of Indianapolis v. 1st Nat'l Bank of Shelbyville.

No. 600.

THE MERIDIAN NATIONAL BANK OF INDIANAPOLIS v. THE FIRST NATIONAL BANK OF SHELBYVILLE.

BANKS AND BANKING.—*Check.*—*Certification of.*—*Effect.*—The certification of a check in the hands of the payee, the body of which is unaltered, releases the drawer from further liability, and creates a direct liability from the bank to the payee, while, as between the bank and the drawer, it operates as a payment to that extent on his account, and, although prior to its being certified, the check may be countermanded by the drawer, after its certification it has passed beyond his control, and he no longer has the power to countermand its payment.

SAME.—*Check for Stolen Goods.*—*Certification of.*—*Assumed Name of Payee.*—*Indorsement in Assumed Name to Bona Fide Assignee.*—*Liability of Drawee to Assignee.*—A. stole two head of cattle from B. and drove them to the Indianapolis Stock Yards and sold them, receiving therefor a check on the Meridian National Bank of Indianapolis, drawn by Stockton, Gillespie & Co., live-stock brokers and dealers, payable to W. C. Smith, a fictitious name given by A. to the brokers, of whose real name they were ignorant, and of the fact that the cattle were stolen they were also ignorant. A. presented the check to the Meridian National Bank, but, being unable to identify himself, they refused payment, but the cashier certified the check, and in the afternoon of the same day A. sold the check to the First National Bank of Shelbyville, indorsing the check in the name of "W. C. Smith." The Shelbyville Bank sent the check to the banking house of S. A. Fletcher & Co. at Indianapolis, a correspondent, for collection; but the drawers having learned that the cattle, for which the check had been drawn, were stolen, and that "W. C. Smith" was not the real, but assumed, name of A., countermanded the payment of the check, and the Meridian Bank refused to pay the same when presented to it through the clearing house. Suit was brought by the Shelbyville Bank against the Meridian Bank for collection.

*Held*, that the indorsement of the check by A., in his assumed name, to the Shelbyville Bank, being the same person to whom payment was intended, made the Meridian Bank liable for its payment, the Shelbyville Bank being an innocent holder for value.

*Held*, also, that as the Shelbyville Bank was a *bona fide* assignee by indorsement for value, it took the check freed from all equities existing between the original parties, and that the indorsement of the

Meridian Nat'l Bank of Indianapolis *v.* 1st Nat'l Bank of Shelbyville.

check by the person to whom it was actually issued, and by whom the drawer intended the money should be received, was an effectual indorsement to pass title to the check to the Shelbyville Bank, and the indorsement was not invalidated by reason of the payee's acting under an assumed name, when he was not really impersonating another individual, it being the identity of the person, and not of the name, which controls the right to the check.

*Held,* also, that the loss on the check should fall on the bank which certified it, and through it upon the drawers who first set it afloat.

Opinion on petition for rehearing by GAVIN, C. J.

From the Marion Superior Court.

*A. C. Harris* and *L. A. Cox,* for appellant.

*R. N. Lamb, R. Hill, B. F. Love* and *H. C. Morrison,* · for appellee.   .         .

GAVIN, J.—The appellee brought this suit in the Marion Superior Court, upon a check certified by appellant.

The case was tried at special term, and on special findings of fact and conclusions of law by the court judgment was rendered in favor of appellant.

On appeal to the general term, this judgment was reversed, and from that reversal appeal is taken to this court.

The facts found, so far as material to the questions presented in this court, are as follows:

"*First.* Heretofore, to wit, on the night of the 3d of September, 1890, William C. Milburn, with another, stole from George W. Ray, near the town of Franklin, Johnson county, Indiana, two head of steers, and drove them to the Indianapolis stock yards for sale, arriving there early in the morning. At that time the firm of Stockton, Gillespie & Co., live stock brokers and dealers, had an office at, and were engaged in business in, the Indianapolis stock yards, situate near the city of Indianapolis, Indiana. Mr. Stockton had the transac-

tion, now to be stated, early in the morning of the 4th of September, 1890.

"Milburn, who was a stranger to Mr. Stockton, requested him to sell the cattle. Stockton called a buyer near by and asked for a bid, which was made at $3.25 per hundred pounds. Stockton replied that was not enough, and started off on an errand of business, when Milburn said to him (Stockton) to sell the cattle, as that price was as much as he expected to receive, and he was in haste to leave the city on the early train. Without complying with this request Stockton stepped away for a few minutes on a matter of other business, and returned, when he found Milburn turning the cattle out of a pen in which they had been placed, to be taken to the scales and weighed, which was done.

"Thereupon Stockton gave a memorandum of the weight and price ($3.25 per hundred pounds) to Milburn, who carried it to Mr. Gillespie in the office; a computation was made, showing that the cattle came to the sum of $68.15. Gillespie asked Milburn (who was an entire stranger to him) what was his name, when he answered 'W. C. Smith,' and thereupon Gillespie made out the following check:

" 'No. 1372.          INDIANAPOLIS, Sept. 4th, 1890.
                MERIDIAN NATIONAL BANK.
"Pay to the order of W. C. Smith, sixty-eight dollars and fifteen cents ($68.15).
                              STOCKTON, GILLESPIE & Co.' "

"Neither of the members of said firm then had any knowledge other than as given aforesaid by Milburn, as to what was his proper name. Milburn and his confederate at once left the office. Stockton was suspicious that the cattle had been stolen from the haste manifested in their sale, as above stated, and because an employe

and solicitor of the firm, who had met Milburn and his confederate when they drove the said stock into the yard, told him (Stockton) that Milburn had given to him (said solicitor) as his (Milburn's) name, that of "Davis." And so he did not ship that day, the said two (2) steers, but kept them until about noon of the day following, to wit, September 5th, 1890, when Mr. Ray came to the stock yards and identified the cattle as his own in the presence of Mr. Stockton.

"*Second.* Early in the morning of the 4th of September, 1890, Milburn (who was an entire stranger to the officers of the Meridian National Bank), presented said check unindorsed, at the said bank, to Mr. Wocher, one of the tellers, for payment. Mr. Wocher then informed him, as he was a stranger, that he must identify himself, which he said he could not do, as he was not acquainted in the city of Indianapolis. Thereupon it was suggested (but whether by Wocher or Milburn, Mr. Wocher, who was the only witness, was unable to recollect) that the check should be certified, and then it could be used at Franklin. At the defendant's bank he represented his name to be "W. C. Smith." Thereupon the bank aforesaid made a certificate on the face of the said check as follows:

"'Certified. $68.15. Meridian National Bank.

WOCHER, *Teller.*'

"And the said check was delivered back to Milburn.

"*Third.* During the afternoon of said September 4th, 1890, Milburn and some other person, during banking hours, went into the bank of the plaintiff at Shelbyville, Indiana, and presented the said check to the cashier of that bank and asked him to purchase it. The cashier did not know the person presenting it, nor the person with him. He was busily engaged in the business of the bank, and thought the face of the person with Mil-

burn was familiar, but did not then know, nor did he know at the trial, the name of such person. Looking at the check, he saw that it was certified, but that it was not indorsed, but relying upon the certification, he thereupon asked the holder of the check to indorse it; he and the person with him turned about to a writing counter across the banking room, and soon returned with the check indorsed upon the back "W. C. Smith," and passed it to the cashier. And thereupon the cashier paid Milburn $68.15, and in the evening mail inclosed the said check to the banking house of S. A. Fletcher & Co., its Indianapolis correspondent, for collection.

"*Fourth.* On the 5th of September, and before the presentation of the check to the Meridian Bank for payment, the drawers of the check having learned that the cattle were stolen, countermanded the payment of the check, and the Meridian Bank, on the 6th of September, refused to pay the same when presented to it through the clearing house, through which it had passed on the 5th, and the check was returned to the plaintiff in the action below.

"*Sixth.* At the time Mr. Wocher certified the said check, he charged the same against the account of Stockton, Gillespie & Co., who then, and for a long time prior thereto, kept their deposits in that bank and had a certified check account.

"*Eighth.* Milburn had never been known in the community where he had lived by any other name than that of W. C. Milburn."

It seems to be well established that, as a general rule, the certification of a check in the hands of the payee, the body of which is unaltered, releases the drawer from further liability, and creates a direct liability from the bank to the payee, while, as between the bank and the drawer, it operates as a payment to that extent on his ac-

count, and, although prior to its being certified, the check may be countermanded by the drawer, after its certification it has passed beyond his control, and he no longer has power to countermand its payment. Daniel on Neg. Inst., sections 1601–1603; Morse on Banking, section 414; Van Schaack on Bank Checks, 91, 92.

Whether or not the liability of the certifying bank may, under certain circumstances, extend even further, we need not now determine.

It is said, in *Born* v. *First Nat'l Bank*, 123 Ind. 78: "That the drawer of a check is released if the holder, instead of presenting it for payment himself, procures it to be certified by the bank upon which it is drawn. If the holder elects to procure the certification of the check, it becomes, in his hands, substantially a certificate of deposit. By his own hand he makes the bank his debtor, * * * and releases the drawer of the check."

The principal question upon which the rights of the parties in this case depend is whether or not the indorsement of the check by Milburn, under the assumed name of Smith, and without identification, was such an indorsement as was effectual to pass to the appellee the title to the check. If it was, it will then be unnecessary for this court to determine a number of the propositions advanced by counsel on each side.

The position of counsel for the appellant may best be stated in their own language: "In other words, the Shelbyville Bank's contention is that the acceptance of an unindorsed check implies three things:

"1st. That the signature of the maker is genuine.

"2d. That the maker has money to his credit which the bank will retain until the check is presented for payment.

"3d. That the holder is the payee, and is entitled to receive the money.

"While the contention of the Meridian Bank is that the certification of the check unindorsed does not waive, but is subject to identification and legal indorsement. Daniel on Neg. Inst., section 1607a.

"And that, as the check was given for stolen cattle, and was not made payable to the real person, William C. Milburn, but to no person, without its knowledge, and for a fraudulent purpose, the indorsement was invalid, and the same in law as if it had been passed over the counter of the Shelbyville Bank, unindorsed, in which case the transferee takes it subject to all equities and defenses."

Under the view which we have taken of this case, it is not required of appellee, in order to sustain the judgment of the court below, that it should maintain the proposition No. "3," as stated by appellant's counsel.  Neither is it necessary that we should determine whether or not it would be permissible to the bank, on the ground of want of consideration or fraud as between the payee and the drawer, to defend against a check certified by it after it has passed into the hands of an innocent holder, even though unindorsed.

It is settled law that the *bona fide* assignee, by indorsement, for value, takes such paper freed from any equities existing between the original parties.  Daniel on Neg. Inst., sections 1608–1652; Morse on Banking, section 419; Van Schaack on Bank Checks, 63–89.

Under the facts of this case, we think that the indorsement of the check by the man to whom it was actually issued and by whom the drawer intended that the money should be received, was an effectual indorsement to pass to the Shelbyville Bank the title to the check, and the indorsement was not as to it invalidated by reason of the payee's acting under an assumed and fictitious name, when he was not really impersonating

any other individual. The check was intended for a person, not a name. Names possess neither personality nor existence. They but serve to identify individuals.

The check was received by the identical person or individual to whom its drawer intended to deliver it, and was by that person indorsed in the name in which it was issued to him. Even the drawer did not have in mind as the payee any other or different individual whom he erroneously believed the person to whom he delivered the check to be.

That it is the identity of the person, and not of the name, which controls the right to the check, is shown by some of the cases cited by counsel—those of *Graves* v. *American Exc. Bank*, 17 N. Y. 205, and *Indiana Nat'l Bank* v. *Holtsclaw*, 98 Ind. 85, where a check or draft was drawn and intended to be sent to one man, but, by some mistake, was received by another of the same name, who transferred it, but his transfer was held to pass no right to the paper, even in the hands of an innocent holder, because although the names were the same the person for whom the paper was intended was different.

An action may be maintained upon an instrument although executed to the party by a name other than his right one if it was really intended to be executed to him. *Wooster* v. *Lyons*, 5 Blackf. 60; *Leaphardt* v. *Sloan*, 5 Blackf. 278; *Rhyan, Admr.*, v. *Dunnigan*, 76 Ind. 178; *Hasselman* v. *Jap. Devel. Co.*, 2 Ind. App. 180, 27 N. E. Rep. 318.

In support of their proposition, that the indorsement of this check was a mere forgery and therefore invalid and ineffectual, counsel rely largely upon the case of *Armstrong* v. *Nat'l Bank*, 46 Ohio St. 512, 22 N. E. Rep. 866, as affording, to use their own expression, "a full discussion of the point under consideration." There one Grimes fraudulently represented himself to be the agent of one

Brown, a fictitious person, and by false representations obtained from Armstrong a check payable to his supposed principal, Brown. Grimes indorsed the fictitious name "William Brown" on the check, and presented it to the bank, which paid it. It was held, giving to the case the construction most favorable to appellant, that the charge against Armstrong on account of the check should be canceled as a forgery regarding the indorsement.

There is between that case and this one in hand a marked distinction in this, that there Armstrong, the drawer of the check, did not intend to make the check payable to the man to whom she delivered it and who afterwards indorsed it, but to another and a different person whom she supposed to exist, although he really had no existence. There the drawer did not intend, by the name used as that of the payee, to designate the man to whom she delivered the check and who afterward negotiated it. There it was not intended by the drawer of the check that the person to whom she delivered it, and who negotiated it, should receive the proceeds of the check. Here it was plainly intended that the man to whom the drawers delivered the check should be the beneficiary of it.

The case of *Dodge* v. *Nat'l Exchange Bank*, 30 Ohio St. 1, upon which the Armstrong case is largely founded, recognizing the principle by which we govern this case, says that the bank paying the check on the forged endorsement "had the right to show if it could that the person to whom the check was delivered was in fact the person whom the drawer intended to designate by the name of Frederic B. Dodge."

Counsel for appellant have cited no case which comes any nearer to the question in hand than the Armstrong

case, nor have we been able to find any favorable to them.

Several general statements are taken from the text-books to the effect that to sign the name of a fictitious or nonexisting person is forgery, citing Byles on Bills, 333; Daniel on Neg. Inst., sections 136, 1345; 1 Bishop on Crim. Law, 432; Chitty on Bills, 182 (*158).

We do not think that any of these statements are really intended to meet such a case as we have here. On the contrary, it is said in one of the sections of Daniel referred to, No. 136: "For this reason bills and notes payable to fictitious payees are not tolerated, and will never be enforced, *save* when in the hands of a *bona fide* holder, who received them without knowledge of their true character."

At section 138 Daniel expressly states his view that an innocent holder is entitled to enforce the paper, although a fictitious indorsement may intervene.

In Chitty on Bills, 181 (*158), this language is used immediately preceding that relied upon by counsel: "Where a bill is drawn in the name of a fictitious person, payable to the order of the drawer, the acceptor is considered as undertaking to pay to the order of the person who signed as drawer, and therefore a *bona fide* indorsee may bring evidence to show that the signatures of the supposed drawer to the bill and to the first indorsement are in the same handwriting."

An examination of the cases cited in support of the text where these statements relied on by counsel are made will show that none of them are of the same character as this. In the main, they are cases where the paper was the creation of the party assuming the fictitious name and was then by him indorsed to others, where quite a different rule might well govern from this, in which the paper set afloat is the creation of another by whom it was intended

to accomplish the very results which it did produce, that is, to pay so much money to the man to whom the check was delivered.

It may also be noticed that the cases supporting these text-book citations are mostly old English cases found in Russell & Ryan's C. C., and Leach's C. C., and they do not seem to be followed, to the extent of counsel's application at least, by even the English courts.

In *Regina* v. *Martin*, 21 Alb. L. J. 91, COCKBURN, C. J., quotes with approval from Dunn's case, 1 Leach C. C. 68, "that if a person give a note entirely as his own, his subscribing it by a fictitious name will not make it a forgery, the credit there being given to himself without any regard to the name or without any relation to a third person."

In *Commonwealth* v. *Baldwin*, 11 Gray, 197, it is held that signing a promissory note in the name of a fictitious firm, of which the writer claimed to be a member, was not forgery.

Whether, however, the offense of Milburn in this transaction be termed a technical forgery or not, both sound reasoning, as it appears to us, and the authorities recognize the right of the Shelbyville bank to enforce its title to this check through this indorsement in controversy.

In *Phillips* v. *ImThurn*, 114 Eng. Com. Law Rep. 694, in an action by the indorsee of a bill against the acceptor, it was held that the acceptor could not defend on the ground that the bill was payable to, and indorsed by, a fictitious payee, of which fact the acceptor had no knowledge.

It was urged there as here that the indorsement was a fiction and a nullity, and therefore could not convey title.

The *Merchants Loan, etc., Co.* v. *Bank, etc.*, 7 Daly, 137, resembles this case in many of its details. One Stearns

Meridian Nat'l Bank of Indianapolis *v.* 1st Nat'l Bank of Shelbyville.

representing himself to be F. W. Frothingham, bought a piano of the Steinways, gave in payment a raised check payable to F. W. Frothingham, and received back for the balance of the check above the purchase price Steinway's check payable to himself by this assumed name of Frothingham. This check he procured to be certified, payment being refused for want of identification, and then transferred it to the Merchants Bank for value. The court held the indorsees obtained a valid title to the check and could enforce it.

The Supreme Court of Massachusetts, while recognizing the general rule that a forgery may be committed by the use of a fictitious name ( *Commonwealth* v. *Costello,* 120 Mass. 358), recognizes, also, the principle that an indorsement in an assumed name may be effectual to convey title to the check. *Robertson* v. *Coleman,* 4 N. E. Rep. 619.

In that case a man stole a team, sold it, and received in payment a check payable to Charles Barney, his assumed but not his real name. This check he indorsed to an innocent holder, without any real identification. Payment was refused, and the holder brought suit against the drawer. The court says: "The name of a person is the verbal designation by which he is known, but the visible presence of the person affords surer means of identifying him than his name. The defendants, for a valuable consideration, gave the check to a person who said his name was Charles Barney, * * * and they made it payable to the order of Charles Barney, intending thereby the person to whom they gave the check," etc.

The court further says, it is clear that "the person they dealt with was the person intended by them as the payee of the check, designated by the name he was called in the transaction, and that his indorsement of it was the indorsement of the payee of the check by that name."

This case is approved and followed in *Emporia Nat'l Bank* v. *Shotwell*, 35 Kan. 360, the court saying: "So, in this case, Shotwell, for the notes and mortgages received by him, sent the draft to a person who said his name was 'Daniel Guernsey, and whose name Shotwell believed to be Daniel Guernsey, * * * intending thereby the person to whom he sent the draft. The National Bank of Emporia received this draft for a valuable consideration, in good faith, from the same person whom the bank believed to be Daniel Guernsey, and who indorsed the draft by that name. * * * Shotwell and Lobdell dealt with the false Daniel Guernsey as though he were the real Daniel Guernsey. Such person, it is true, obtained the draft from Shotwell by fraudulent letters and representations, but the national bank is not responsible for the letters and representations of the false Daniel Guernsey. * * * The National Bank of Emporia paid the draft to the person to whom it was sent by Shotwell, and such person received the money from the bank thereon."

These cases go farther than it is necessary for us to go in this case.

In Bolles on Banks, section 233, the rule is thus laid down: "A bank is also liable to the *bona fide* holder of a certified check, though obtained from the drawer by fraud and drawn to the order of a fictitious person, if indorsed to the holder by the person to whom the drawer intended that payment should be made."

The principle which governs in this case is approved in *Metzger* v. *Franklin Bank*, 119 Ind. 359.

In that case, one Lord owned certain land. Hornaday, falsely pretending to be Lord, opened communication with Metzger and offered to sell him the land. Metzger, believing he was Lord, prepared a deed and caused it to be sent to the Franklin Bank, with instructions to have it signed by Lord and pay the purchase price. The deed

was executed by the false Lord, returned to Metzger, who accepted it, supposing it to be genuine, and reported back to the bank that it was all right, and the bank paid Hornaday the money. The fraud was afterwards discovered by Metzger. The court says: "But did not the appellee transact the business intrusted to it in accordance with the instructions received, and pay the money to the person that the appellant intended should receive it? We are of the opinion that it did."

As is held in the *Bank* v. *Shotwell*, *supra*, we do not deem the failure of the Shelbyville Bank to require identification to be an important factor in this case, for the reason that the money was undoubtedly paid by it to the identical man designated as the payee by the drawer. There being no mistake as to the identity, in fact, it is immaterial whether the identity was properly shown to the bank or not.

Our conclusion then, from all the cases, is that the loss on this check should fall on the bank which certified it, and through it upon its drawers who first set it afloat. As they dealt with the payee of the check as Smith, and had no intention, when executing the check, of delivering it to any person other than the man who actually received it, the Shelbyville Bank was justified in accepting his indorsement, and can hold the certifier of the check for it.

The judgment of the superior court, in general term, is affirmed, with costs.

Filed Feb. 1, 1893.

## On Petition for a Rehearing.

GAVIN, C. J.—Counsel for appellant have filed quite an earnest petition for rehearing, in which they assail the proposition of the original opinion that the appellee, if a *bona fide* assignee by indorsement for value, took the

certified check freed from any equities existing between the original parties. They assert the opinion to be in direct conflict with the case of *Parke* v. *Roser*, 67 Ind. 500.

We have examined the case carefully, as we did in the former hearing, and are unable to see the slightest conflict between the holding in this case and the decision in that. There no such question as here presented was under consideration. That case simply holds that the certifying bank does not guaranty the genuineness of the body of the check, following the *Marine Bank* v. *Nat'l City Bank*, 59 N. Y. 67.

This was the only question before that court for its determination. A careful re-examination of the brief of counsel for appellants shows that they themselves did not controvert their liability, if the appellee was a *bona fide* holder for value and by indorsement. Their claim was that there was no legal and valid indorsement, and that therefore the check was subject to equities, relying upon *Freund* v. *Importers, etc., Bank*, 76 N. Y. 352, and kindred cases.

To show their position upon this subject, we quote from their brief, somewhat in addition to what was set out in the original opinion:

"It follows, therefore, that Stockton, Gillespie & Co. could countermand payment at any time of this check, *so long as it* remained out in the hands of the thief, *or any other person taking it with notice*. Or to put the proposition from the other side, *until* the check comes in due course of business to *the hands* of *a bona fide holder for value without notice*, neither the maker or the banker can be compelled to pay a check given for stolen cattle, or otherwise invalid."

In support of their claim, appellants quoted also the

following from the case of *Goshen Nat'l Bank* v. *Bingham* (118 N. Y. 349), 23 N. E. Rep. 180:

"It is too well settled by authority, both in England and in this country, to permit of questioning, that the purchaser of a draft or check who obtains title without an indorsement by the payee holds it subject to all equities and defenses existing between the original parties, even though he has paid full consideration, without notice of the existence of such equities and defenses." . (Citing very many cases.) "The reasoning on which this doctrine is founded may be briefly stated as follows: The general rule is that no one can transfer a better title than he possesses. An exception arises out of the rule of the law merchant as to negotiable instruments. It is founded on the commercial policy of sustaining the credit of commercial paper. Being treated as currency in commercial transactions, such instruments are subject to the same rule as money. If transferred by indorsement, for value, in good faith and before maturity, they become available in the hands of the holder, notwithstanding the existence of equities and defenses which would have rendered them unavailable in the hands of a prior holder. * * * The bank did certify that it had the money, would retain it, and apply it in payment, provided the check should be indorsed by the payee. * * If the check had been transferred to plaintiffs by indorsement, the defendant would have had no defense, not because of the doctrine of estoppel, but upon principles especially applicable to negotiable instruments."

Our own Supreme Court, in the case of *Born* v. *First Nat'l Bank,* 123 Ind. 78, referred to in the original opinion, expressly says that the certifying bank becomes bound for the payment of the check it certifies, there being in that case no question involved as to the genuine-

ness of the check in all its parts. This shows, as in fact do all the cases, that the literal interpretation given by counsel to some of the argumentative language used in the case of *Parke* v. *Roser, supra,* is not justified.

The decision in the original opinion was intended to be, and we still think was, kept strictly within the facts of this particular case, going no further than was required in order to dispose of the merits of the cause.

After careful consideration, we are still satisfied that the proposition announced, of which complaint is made, is in harmony with the authorities cited and the many cases upon which they are founded.

The petition for rehearing is, therefore, overruled.

Filed June 24, 1893.