## CORINTH BANK & TRUST CO. *v.* SECURITY NAT. BANK.[*]

### (*Jackson.* April Term, 1923.)

1. **BILLS AND NOTES.** Pledgee buying in after notice of fraud cannot recover full amount of certificate of deposit.

A bank, which took a certificate of deposit issued by another bank as collateral security for a note, without notice of the fraud by which the certificate was secured, but which had received notice of the fraud before it bought the certificate at its sale under the pledge agreement is a *bona-fide* holder only for the amount of the debt secured by the certificate, and cannot recover the face value of the certificate. (*Post, pp.* 144-146.)

Cases cited and approved: Memphis Bethel v. Bank, 101 Tenn., 130; Yellowstone Nat. Bank v. Gagnon, 19 Mont., 402; Benton v. Sikyta, 84 Neb., 808; Stevens v. Barnes, 43 N. D., 483; Fox v. Cortner, 145 Tenn., 482

Code cited and construed: Sec. 3516a58 (T.-S.).

2. **BILLS AND NOTES.** Circumstances held not to show bad faith in loaning on credit of certificate of deposit procured by fraud.

The fact that complainant bank took a certificate of deposit as collateral security for a loan asked for by a man, whose appearance indicated that he might be a mechanic, without investigating, though the surrounding circumstances were suspicious and did arouse the suspicion of the bank's officers, *held* not to show bad faith in taking a certificate, which is necessary to constitute notice of the infirmity under Thompson's Shannon's Code, section 3516a55, especially as against the bank, which issued the certificate to the same individual upon his unsupported statement that

---

[*]On extent of recovery by pledgee on negotiable paper which pledgeor could collect see notes in 44 L. R. A., 243 and 11 A. L. R., 952.

On effect of knowledge of consideration by purchaser of note which did not indicate the nature of its consideration as required by statute see note in 24 L. R. A. (N. S.), 1057.

Certificate of deposit as a negotiable instrument is discussed in note in L. R. A., 1918C, 691.

For authorities discussing effect of fraud in the inception of a bill or note to throw upon a subsequent holder the burden of proving that he is a holder in due course see note in 18 A. L. R., 18.

Corinth Bank & Trust Co. v. Security Nat. Bank.

he had funds on deposit in another bank against which he drew a draft. (*Post, pp.* 146-148.)

Cases cited and approved: Bank v. Butler, 113 ·Tenn., 574; Bank v. Chapman, 122 Tenn., 415.

Case cited and distinguished: Cheever v. Pittsburgh, etc., Co., 150 N. Y., 65.

Code cited and construed: Sec. 3516a55 (T.-S.).

3. **BILLS AND NOTES.** Certificate of deposit payable to order is ''negotiable instrument.''

A certificate of deposit issued by a bank and payable to the order of the depositor named therein is a "negotiable instrument." (*Post, pp.* 148, 149.)

Cases cited and approved: Easley v. Bank, 138 Tenn., 369; Ford v. Brown, 114 Tenn., 467.

4. **BILLS AND NOTES.** Evidence held to show certificate of deposit was issued in fictitious name.

In a suit against a bank on a certificate of deposit brought by the indorsee of the certificate, evidence *held* to show that the name given by the man to whom the certificate was issued was fictitious, and that the person who indorsed the certificate to complainant and pledged it as collateral security for a loan was the same person as the man to whom it was issued by defendant. (*Post, pp.* 149-151.)

Case cited and approved: Capitol Hill State Bank v. Rawlins Nat. Bank, 24 Wyo., 423.

5. **BILLS AND NOTES.** Holder under indorsement of one to whom instrument was issued in fictitious name is bona-fide holder.

Where a certificate of deposit was issued in a fictitious name, given by the person to whom it was intended to be made payable, one who took it on indorsement of the fictitious name by that person is a *bona-fide* holder, if he gave value, and not a holder under a forged indorsement. (*Post, p.* 151, 152.)

Case cited and approved: Meridian Nat. Bank v. First Nat. Bank, 7 Ind. App., 322.

6. **BILLS AND NOTES.** Instrument payable to fictitious name is not payable to bearer, unless so intended by maker.

In view of Thompson's Shannon's Code, section 3516a8, subsec. 3, providing that an instrument is payable to bearer when it is payable to the order of a fictitious or nonexisting person and such fact was known to the person making it so payable, an instrument payable to a person under a fictitious name given by him but not known by the maker to be fictitious is not payable to bearer. (*Post*, *pp.* 152, 153.)

Code cited and construed: Sec. 3516a8, subsec. 3 (T.-S.).

7. **ELECTION OF REMEDIES.** Suit in alternative as pledgee and purchaser held not an election.

Where a bank had taken a certificate of deposit as collateral security for a note, and had sold the certificate under the terms of the pledge, after receiving notice that it was procured by fraud and that the bank issuing it would not pay it, a suit in the alternative against the issuing bank seeking recovery of the full amount of the certificate as owner, or of the amount of the note as pledgee, was not a binding election to sue, as owner. (*Post*, *p.* 153, 154.)

Cases cited and approved: Phillips v. Rooker, 134 Tenn., 457; Stamper v. Venable, 117 Tenn., 557; Real Estate Co. v. Kyoleum Co., 142 Tenn., 295.

8. **BILLS AND NOTES.** Pledgee cannot recover attorney's fee from maker of collateral.

Even if a note secured by pledge entitled the payee to a twenty per cent. attorney's fee, the payee cannot recover such fee from the bank which issued a certificate of deposit pledged to secure the payment of the note, on which it was liable, in view of the fraud in procuring the note, only for the amount advanced by the pledgee before it received notice of the fraud. (*Post*, *p.* 154.)

9. **DAMAGES.** Attorney's fee cannot be recovered.

Ordinarily a litigant cannot collect his attorney's fees from his adversary, however wrongful may have been the suit, or however groundless the defense (*Post*, *p.* 154.)

FROM MADISON.

Error to the Chancery Court of Madison County.—Hon. W. H. Denison, Chancellor.

Boone & Worsham and Bond & Bond, for plaintiff in error.

R. F. Spragins and C. W. Hewgley, for defendant in error.

Mr. Malone, Special Judge, delivered the opinion of the Court.

This case involves the rights of the holder of a certificate of deposit, fraudulently obtained, as against the bank issuing the certificate.

A man, calling himself "J. W. Jones," went to the defendant, Security National Bank of Jackson, Tenn., on December 8, 1919, and stated to the assistant cashier that he had $4,000 on deposit in the First National Bank of Birmingham; that he wished to transfer this money to the Security National Bank, and place $2,000 in a checking account and $2,000 on a time deposit. He thereupon drew a sight draft on the First National Bank of Birmingham for $4,000, and the assistant cashier of the Security National Bank placed $2,000 to the credit of "J. W. Jones" in a checking account, and issued the following certificate of deposit:

"The Security National Bank. No. 1837.

"Jackson, Tenn., Dec. 8, 1919. $2000.00.

"J. W. Jones has deposited in this bank two thousand dollars, two thousand dollars, payable to the order of himself on the return of this certificate properly indorsed

"P. C. Stovall, A. Cashier.

"Interest at the rate of three per cent. per annum if left three months.

"Certificate of deposit.

"Not subject to check."

Indorsed: "J. W. Jones."

The person who represented himself to be J. W. Jones in this transaction is thus described by the assistant cashier:

"He was a man about forty-five years of age, about 150 or 160 pounds in weight, and appeared to be a laboring man or farmer or trader, and was dressed in working clothes."

On December 26, 1919, a man calling himself "J. W. Jones" went to the complainant Corinth Bank & Trust Co., at Corinth, Miss., and was introduced to the assistant cashier as "Mr. Jones," by some one whom the official thought he knew, but whom he could not afterward specifically describe or identify.

The man thus introduced stated that he was from Belmont, Miss., and that he wished to buy a tract of land and lacked about $550 of the amount he thought the land would sell for; and that he wished to borrow $550 for thirty days. As collateral for the proposed loan he offered the $2,000 certificate of deposit already mentioned.

The assistant cashier of the Corinth Bank, Mr. Anderson, says that he knew the signature of Mr. Stovall, which appeared on the certificate of deposit, and knew his connection with the Jackson Bank, and therefore had no hesitancy in accepting the collateral. After a brief conference with the cashier, Mr. Holley, he informed the applicant that the loan would be made, and the latter thereupon indorsed the certificate of deposit "J. W. Jones,"

and received the $550, after executing the following note:
"$550.00.    Corinth, Mississippi, Dec. 26, 1919.

"Thirty days after date I promise to pay to the Corinth
Bank & Trust Co., or bearer, five hundred fifty dollars,
with interest from date at ten per cent. per annum, pay-
able at Corinth Bank & Trust Co., without defalcation,
for value received, and have pledged as collateral security
C. of D. Security B. & Tr. Co. Jackson, Tenn. $2000. Due
Mar. 8th, 1920.

"And do agree on demand to deposit with the holders
such additional security as they may from time to time
require, and in default thereof this note shall instantly
become due and payable as though it had actually matured,
and upon default of payment of maturity, whether such
maturity occurs by expiration of time or default in de-
positing additional security as above agreed, do hereby au-
thorize and empower the holders hereof for the purpose of
liquidation of this note, and of all interest, attorney's
fees and costs thereon, to sell, transfer, and deliver the
whole or any part of such security, or any additions there-
to, or substitutes therefor, without any previous demand,
advertisement or notice, either at broker's board or pub-
lic or private sale at any time or times thereafter, with the
right on the part of such holders to become the purchaser
and absolute owner thereof, free of all trusts and claims.
And it is further agreed that the securities hereby pledged,
together with any that may be pledged hereafter, shall be
applicable in like manner to secure the payment of any
past or of any future obligations of the undersigned held
by the holders of the obligation, and all such securities in
their hands shall stand as one general continuing collateral
security for the whole of said obligations, so that the de-

ficiency of any one shall be made good from the collaterals for the rest, hereby remaining responsible for any deficiency in payment, and waiving any benefit, exemptions or privilege under the law now or hereafter to be in force.

J. W. JONES.

"No. 20370. Due 1/25/20.

"Notified Jan. 17, 1920.

"Belmont, Miss. [Revenue Stamps.]"

Concerning the appearance of "J. W. Jones," Mr. Anderson testifies:

"Mr. Jones was dressed in a suit of overalls and was not clean shaven, having the appearance of a mechanic."

Meanwhile the Jackson bank had forwarded the draft on the Birmingham bank in the usual manner and the draft had been returned unpaid —"the reason given was that the signature did not agree with one on file." It appears that two depositors of the Birmingham bank bore the name "J. W. Jones," but the drawer's signature did not correspond to either of their signatures. One of these depositors had a balance of $4.72 to his credit when the draft was presented, and the other a balance of $4.05.

The fictitious "J. W. Jones" at the time of his arrangement with the Jackson bank gave his address as "202 N. Missouri St., Bemis, Tenn."—Bemis being a village some three miles from Jackson. After the draft was returned unpaid, an effort was made by the Jackson bank to locate the drawer, and it was then ascertained that no one by that name lived at that address, or had previously lived there.

The Jackson bank then charged off the $2,000 deposit in the checking account.

The thirty-day note given to the Corinth bank matured

January 26, 1920, and on January 17, 1920, the bank sent a notice of the maturity to "J. W. Jones" at Belmont, Miss.

No attention was paid to the note at maturity, and, accordingly, "along about the 1st of February, 1920," Mr. Holley telephoned the Jackson bank asking "if they knew the address of J. W. Jones."

Mr. Stonewall answered the call and asked how much had been loaned on the certificate. Being informed of the amount, he said (so Holley testifies) :

"The whole transaction is a fraud, but if you will draw draft on us and attach your note and certificate for the amount, we will be very glad to pay the amount that you paid for the certificate."

Mr. Holley, thereupon, drew on the Jackson bank for the $550 with interest, attaching note and certificate of deposit, but the Jackson bank thereafter refused to pay the draft.

The Corinth bank, having failed in its effort to secure payment of the money loaned, finally advertised the certificate of deposit for sale, pursuant to the terms of the thirty-day note executed by "Jones," and sold the same at public auction on November 26, 1920, and itself became the purchaser.

A representative of the Jackson bank attended the sale, and gave public notice that said certificate was issued without consideration and procured by fraud; that the alleged payee was not J. W. Jones; and that the Corinth bank was not an innocent purchaser and had acquired no title thereto.

Thereafter the original bill herein was filed; the Corinth bank claiming the right to collect the full amount of the

certificate, and, in the alternative, the right to recover the amount of the note, with interest and attorney's fees.

The chancellor granted the alternative relief, giving a decree for the face of the note with interest and twenty per cent. attorney's fees; and the Jackson bank appealed.

The Corinth bank filed the record for writ of error and complains of the chancellor's action in refusing a decree for the full amount of the certificate of deposit.

1. We think the chancellor correctly denied a recovery for the full value of the certificate.

The Corinth bank, at the time of the auction sale and purchase of this certificate, was fully advised of the fraud attendant upon its issuance. It had only advanced $550 before being informed of this fraud; and it would be inequitable to allow it to claim more than the amount of its advancement. *Memphis Bethel* v. *Bank,* 101 Tenn., 130, 133, 134, 45 S. W., 1072; *Yellowstone National Bank* v. *Gagnon* (1897), 19 Mont., 402, 48 Pac., 762, 44 L. R. A., 243, and case note, 61 Am. St. Rep., 520; *Benton* v. *Sikyta* (1909), 84 Neb., 808, 122 N. W., 61, 24 L. R. A. (N. S.), 1057, and case note.

In Ruling Case Law, it is said that—"If a note is valid between the original parties, an indorsee who holds it as collateral may recover the face thereof, with accrued interest, retaining any surplus as trustee for the party beneficially entitled thereto, after his own claim is satisfied; but if the note is invalid as between the immediate parties, one who holds it as collateral security may recover only the amount of his claim to which the note is collateral—the reason being that as to any surplus over and above that sum he would be a trustee for his trans-

feror, who is entitled to nothing from the defrauded party." 3 R. C. L., 1061, 1062.

As stated by Mr. Daniel, the pledgee is "a *bona-fide* holder, and entitled to stand upon a better footing only *pro tanto*." Daniel on Negotiable Instruments, section 832a.

And as said in *Memphis Bethel* v. *Bank supra* (a case where an official of a corporation had pledged two negotiable bonds belonging to it to a bank for his personal debt) :

"The principle is that the holder is entitled to recover only the actual amount paid out and legal interest, and to that extent is an innocent purchaser."

*A fortiori* the rule should apply where a pledgee is attempting to assert a title which it claims to have acquired by public sale of the collateral, after full notice of the fraud committed by the pledgor.

2. It is insisted by the defendant, on several grounds, that the complainant bank is not entitled to recover even the amount of the money advanced, with interest, and in this connection several contentions are advanced.

(a) It is claimed that the Corinth bank is not a *bona-fide* purchaser for value, in lending the money on the faith of the deposit certificate as collateral; that, by reason of various facts and circumstances surrounding the transaction, it has failed to sustain the burden cast upon it in this behalf, by reason of the fraud which tainted the original transaction. Negotiable Instrument Act (Thompson's Shannon's Code, section 3516a58) ; *Stevens* v. *Barnes,* (1919), 43 N. D., 483, 175 N. W., 709, 18 A. L. R., 10, and case note; 3 R. C. L., 1043; *Fox* v. *Cortner,* 145 Tenn., 482, 496, 239 S. W., 1069, 22 A. L. R., 1341.

In this connection it is said that the circumstances under which the fictitious "J. W. Jones" obtained the loan from the Corinth bank were highly suspicious.

It is pointed out that the man's appearance (partially unshaven and dressed in overalls), should have attracted attention in a transaction of this size; that he claimed to have $2,000 on deposit in a bank only fifty odd miles away, drawing only three per cent. interest, and yet was willing to pay ten per cent. interest for a loan of $550; that he claimed to be engaged in a land trade, and yet wanted actual cash instead of making his payment by check.

It is further pointed out that the assistant cashier must have had some doubt, for he consulted the cashier; and that the latter in turn must have had some doubt, for he, as disclosed by his deposition, "told Mr. Anderson (the assistant cashier) to satisfy himself that everything was all right."

It is further insisted that, by the general rule of the bank, two members of the finance committee would pass upon the acceptability of the collateral offered, and that the bank violated this rule in making the loan in question.

It is also claimed that the assistant cashier and the cashier showed no diligence as to the identification of the person calling himself "J. W. Jones;" that Jackson is only some fifty miles from Corinth, and a telephone communication with the Jackson bank (which could have promptly and easily have been had), would have disclosed the fraud, and prevented all loss.

Prior to the enactment of the Negotiable Instrument Law (Acts 1899, chapter 94), this court followed the rule

of constructive or implied notice in testing the *bona-fides* of the purchaser of a negotiable instrument. *Bank* v. *Butler,* 113 Tenn., 574, 582, 583, 83 S. W., 655.

But, by the terms of that act, as pointed out in the above case, the old rule was abolished, and the question is governed by section 56 of the Negotiable Instrument Act (Thompson's Shannon's Code, section 3516a55), reading as follows: "To constitute notice of an infirmity in the instrument, or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

It is insisted that, conceding this to be the rule, the circumstances above set forth show actual bad faith on the part of the Corinth bank in advancing money on the faith of this certificate of deposit.

We are unable to agree to this contention.

The Corinth bank certainly used more diligence than did the Jackson bank, when it issued the certificate of deposit. It seems apparent that the same man dealt with each bank, and it was far more negligent for the Jackson bank to give a mechanic or working man a negotiable certificate of deposit, on his bare statement that he had $4,000 on deposit in Birmingham, than it was for the Corinth bank to advance $550 on an admittedly genuine certificate of deposit, signed by an officer of the Jackson bank, with whose signature and official position the agents of the Corinth bank were familiar. Moreover, the officials of the Jackson bank need only have telephoned to Bemis, Tenn., just three miles away, to have discovered that the so-called "J. W. Jones" was an imposter.

In the case of *Cheever* v. *Pittsburgh, etc., Co.,* 150 N. Y., 65, 44 N. E., 701, 34 L. R. A., 69, 55 Am. St. Rep., 646 (quoted with approval in *Bank* v. *Butler, supra,* 113 Tenn., at page 584, 83 S. W., at page 657), the court said:

"There is not much difficulty in stating the rule of law defining the duties and obligations of a party to whom negotiable paper is presented for discount or sale before due. He is not bound at his peril to be on the alert for circumstances which might possibly excite suspicion of wary vigilance. He does not owe to the party who puts the paper afloat the duty of active inquiry in order to avoid the imputation of bad faith. The rights of the holder are to be determined by the simple test of honesty and good faith, and not by a speculative issue as to his diligence or negligence. The holder's rights cannot be defeated without proof of actual notice of the defect in title or bad faith on his part, evidenced by circumstances. Though he may have been negligent in taking the paper, and omitted precautions which a prudent man would have taken, nevertheless, unless he has acted in *mala fide,* his title, according to settled doctrine, will prevail."

As stated in *Bank* v. *Chapman,* 122 Tenn., 415, 422, 123 S. W., 641, 643, the title of the purchaser will not be defeated where he receives the instrument "under merely suspicious circumstances."

We assume, of course, in applying the above rule to the case, that the certificate of deposit is a negotiable instrument; and this proposition, indeed, cannot be controverted. *Easley* v. *Bank,* 138 Tenn., 369, 373, 198 S. W., 66, L. R. A., 1918C, 689; *Ford* v. *Brown,* 114 Tenn., 467, 88 S. W., 1036, 1 L. R. A. (N. S.), 188.

We think, therefore, that the Corinth bank was not

guilty of bad faith or willful blindness in making the loan and accepting the collateral offered.

All that the record discloses is a certain amount of carelessness, by no means so great as the negligence of the Jackson bank in issuing the certificate of deposit.

Banking business must be transacted on the assumption that people are acting honestly and in good faith—which in the vast majority of cases is true. We feel assured that it never occurred to the officials of either bank to suspect that this respectable "working man" was an accomplished criminal—a criminal so adroit that no trace of him had been found when the record in this case was made up.

(b) It is next insisted by the defendant that the Corinth bank could not be an innocent purchaser, because the name of "J. W. Jones" was forged on the indorsement on the certificate of deposit, and that forgery is a defense even as against a *bona-fide* holder.

But we do not think that the record shows a case of forgery. It is rather a case where the negotiable instrument is issued in a fictitious name. The man who came to the Jackson bank gave the name "J. W. Jones," and the residence "202 N. Missouri St., Bemis, Tenn." Subsequent inquiry disclosed that the residence was fictitious, and there is no reason to suppose that the name was genuine. Nor does the fact that the Birmingham bank happened to have two small depositors by that name alter the case. Few banks, it may be surmised, in any considerable town or city, are unable to muster a J. W. Jones among their depositors. In spite of the illustrious individuals who have, in some instances, borne them, there is nothing distinctive about the names "Jones" and "Smith." In law books and in common parlance they are the sup-

positious names used by way of illustration as freely as "A." and "B." or "Doe" and "Roe."

Another circumstance, not previously mentioned, leads us to believe that the name "Jones" was purely fictitious.

It appears from the testimony that on December 6, 1919, just two days before the successful fraud practiced upon the complainant, a man giving the name "J. H. Johnson" went to another Jackson bank, and asked if there was any way to transfer $2,850 from the "First National Bank of Baltimore." The man gave his residence as "Bemis, Tenn.," saying that he had just moved there and knew nobody. The bank official on this occasion was more wary and told him that his draft for that amount would be received for collection, but that he could not check against it until the draft went through. The stranger thereupon drew on the Baltimore Bank, signing the name "J. H. Johnson," and the draft was forwarded for collection; but "in due course of time" (presumably several days thereafter) the draft was returned unpaid—"no such account."

Asked to describe "Johnson," the official replied:

"Well he was a man of about five feet six or eight inches, very ordinary dress, in fact dressed very much like a laborer, very ignorant looking, and sort of hesitated in his speech; that's about all I know now—I don't know whether I would know him if I were to see him."

(c) It may be true, as contended by the defendant, that the mere fact of possession of a negotiable instrument. is not sufficient to show title, or that the indorsement is genuine, where such indorsement is denied. *Capitol Hill State Bank* v. *Rawlins Nat. Bank* (1916), 24 Wyo., 423, 160 Pac., 1171, 11 A. L. R., 937, and case note.

---

---

But conceding the burden of proof to be on the complainant, in view of the sworn denial made in defendant's answer, it seems to us a reasonable inference from the record that the same individual, whether he called himself "Jones" or "Johnson," obtained the certificate from the Jackson bank, and indorsed it to the Corinth bank. The certificate presented to the Corinth bank was the same one which the Jackson bank issued.

Mr. Stovall, assistant cashier of the Jackson bank, gave his deposition some weeks after the deposition of Mr. Anderson, cashier of the Corinth bank, was given; yet each gives the same general description of "J. W. Jones." Anderson says he "was dressed in a suit of overalls" and had "the appearance of a mechanic." Testifying thereafter, Stovall says:

"He was a man of about forty-five years of age, about 150 or 160 pounds in weight and appeared to be a laboring man or farmer or trader, and was dressed in working clothes."

These circumstances are, perhaps, slight; but the Jackson bank did not even attempt to show that the signature of the draft differed from the indorsement of the certificate, although it had possession of both instruments for some days.

We are, therefore, of opinion that the name "J. W. Jones" was fictitious, and that the same individual, under that assumed name, dealt with both banks.

In the case of *Meridian National Bank* v. *First National Bank* (1893), 7 Ind. App., 322, 33 N. E., 247, 34 N. E., 608, 52 Am. St. Rep., 450, the vendor of stolen cattle used the fictitious name "W. C. Smith," and a check on an Indianapolis bank was issued to him in that name. Using the

same name, he procured the check to be certified, and then cashed it at a bank in Shelbyville, Ind., indorsing thereon the fictitious name "W. C. Smith."

"Under the facts of this case," said the court, "we think that the indorsement of the check by the man to whom it was actually issued, and by whom the drawer intended that the money should be received, was an effectual indorsement to pass to the Shelbyville bank the title to the check, and the indorsement was not as to it invalidated by reason of the payee's acting under an assumed and fictitious name, when he was not really impersonating any other individual. The check was intended for a person, not a name. Names possess neither personality nor existence. They but serve to identify individuals. The check was received by the identical person or individual to whom its drawer intended to deliver it, and was by that person indorsed in the name in which it was issued to him."

It is hardly necessary to observe that this is not a case where a negotiable instrument, issued in a fictitious name, becomes payable to bearer, for this rule applies only where there is an intention to make the instrument so payable.

"The maker's intention is the controlling consideration which determines the character of such paper. It cannot be treated as payable to bearer, unless the maker knows the payee to be fictitious, and actually intends to make the paper payable to a fictitious person." 3 R. C. L., 881.

The language of the Negotiable Instrument Act is, indeed, controlling, for by subsection 3 of section 3516a8 (Thompson's Shannon's Compilation), it is provided that an instrument is payable to bearer "when it is payable to the order of a fictitious or nonexisting person, and such

fact was known to the person making it so payable."

(d) The defendant also contends that the complainant bank was put to an election to claim, either as owner of the certificate under the sale, or as pledgee of the certificate, and that it has elected to claim as owner. It is further insisted that since this claim cannot be sustained, as we have held, the complainant is precluded from recovering the amount actually advanced.

While it is true, as stated by the defendant, that a man may not at the same time be the absolute owner and the pledgee of a certificate, we do not think that, under the facts of this case, a binding election to claim solely as owner was made by the complainant, and defendant's able counsel have cited no authority in point.

We recognize fully the rule established by this court in *Phillips* v. *Rooker,* 134 Tenn., 457, 466, 184 S.. W., 12, *Stamper* v. *Venable,* 117 Tenn., 557, 561, 97 S. W., 812, and other Tennessee cases, to the effect that a litigant may not assume inconsistent positions.

We also recognize the fact that the right of election can be exercised but once. *Real Estate Co.* v. *Kyoleum Co.,* 142 Tenn., 295, 301, 218 S. W., 821, 14 A. L. R., 944.

In this case, however, the complainant, so far from electing, was evidently uncertain as to its rights, and filed its bill in the alternative. It did not sue merely as owner of the certificate. The fact that it bought in the certificate cuts no figure. The natural way to enforce its rights was by a sale of the collateral, after the Jackson bank had refused to reimburse it the amount advanced with interest; and the public announcement made by the representative of the Jackson bank at the sale precluded the possibility of other bidders.

We are therefore of opinion that the chancellor's decree was right, in so far as it allowed the complainant to recover the $550 advanced, together with lawful interest.

3. It is insisted by the defendant that in any event the chancellor should not have taxed it with a twenty per cent. attorney's fee, and this contention must be sustained.

The Jackson bank was not a party to the note executed by the fictitious "J. W. Jones." It had no contractual relations with the Corinth bank.

An agreement to pay an attorney's fee is a valid and binding stipulation, in so far as the maker of a note is concerned.

If the note in the present case contains such a stipulation (which is doubtful), the defendant bank was not a party to it.

It is, of course, well settled that a litigant ordinarily cannot collect his attorney's fees from his adversary, however wrongful may have been the suit, or however groundless the defense.

In his work on Damages (9th Ed.), vol. 1. section 229, Sedgwick says: "We have seen that in order to recover complete compensation, the plaintiff should, in case he is successful, be allowed the expenses of litigation. Nevertheless, the general rule is that counsel fees are not recoverable as damages. The law awards to the successful party his taxable costs, but the fees which he pays to counsel are not taken into consideration."

The decree of the chancellor with be modified by striking out the twenty per cent. attorney's fee allowed to the complainant, and, as thus modified, will be affirmed.