J. W. STARKEY *v.* W. T. & W. J. NIXON *et al.**

T. F. ALLISON *v.* SAME.

(*Nashville.* December Term, 1924.)

1. **WAREHOUSEMEN. Deposit of warehouse receipts held pledge.**
   Deposit by broker of negotiable warehouse receipts with customer, to whom he was indebted for stock which he had converted, *held* a pledge. (*Post, pp.* 641, 642.)

Acts cited and construed: Acts 1909, ch. 336, secs. 2, 3, 5.

2. **WAREHOUSEMEN. Warehouse receipts held to sufficiently state location of warehouses.**
   Warehouse receipts, purporting to be negotiable within Acts 1909, chapter 336, section 5, specifying location of warehouses, as in certain cities, *held* to sufficiently designate location within section 2, even though one of them was in suburbs of city designated. (*Post, pp.* 642, 643.)

3. **WAREHOUSEMEN. Warehouse receipts for cotton held to sufficiently identify goods.**
   Warehouse receipts, each for one bale of cotton, specifying the marks, weight, grade, and staple condition, *held* to sufficiently describe goods for identification according to usages of cotton trade, within requirements of Acts 1909, chapter 336, section 2. (*Post, p.* 643.)

4. **WAREHOUSEMEN. Warehouse receipts reciting cotton was accepted for storage for year negotiable.**
   Warehouse receipts, reciting that cotton was accepted for storage for one year from date only, and pledged more than year after date, *held* negotiable, especially in view of Acts 1909, chapter 336, section 5, requiring that no provision shall be inserted in negotiable receipt that it is nonnegotiable. (*Post, pp.* 643, 644.)

5. WAREHOUSEMEN.   Pledgee of warehouse receipts purchaser for value.          .

Pledgee of negotiable warehouse receipts *held* purchaser for value under Acts 1909, chapter 336, section 58.   (*Post, p.* 644.)

6. WAREHOUSEMEN.   Pledgee of negotiable warehouse receipts held ''purchaser without notice.''

Where negotiable warehouse receipts were pledged by broker to customer to secure return of stock, and broker's reputation was good, and receipts indorsed in blank, pledgee without actual notice that receipts were not brokers, *held* purchaser without notice within meaning of Acts 1909, chapter 336, sections 41, 47, 58, notwith standing he might have suspected his own stock had been stolen.   (*Post, pp.* 645-648.)

Cases cited and approved: Bank v. Butler, 113 Tenn., 574; Bank v. Chapman, 122 Tenn., 415; Corinth Bank & Trust Co. v. Security National Bank, 148 Tenn., 136.

Case cited and distinguished: Cheever v. Pittsburgh, etc., Co., 150 N. Y., 66.

7. FACTORS.   Rule of ''ejusdem generis'' applied to construction of Factors' Act.

Acts 1915, chapter 98, as to transfer of bills of lading, warehouse receipts, etc., by "factor or agent" applies only to agents engaged in business similar to factors, under rule of *"ejusdem generis"* that where general words follow special words which limit scope of statute, such general words will be construed ordinarily as applying to things of the same kind or class as those indicated by the preceding special words. (*Post, pp.* 648-650.)

8. WAREHOUSEMEN.   Factors' Act held not to repeal warehouse receipts act.

Acts 1915, chapter 98, as to transfer of warehouse receipts, etc., by factors or agents, *held* not to extend to agents generally, as those in stock brokerage business who acquire warehouse receipts, and thereby repeal Acts 1909, chapter 336, by implication, especially in view of Acts 1919, chapter 118, sections 33, 38, 76, which almost

in terms re-enact Acts 1909, chapter 336, sections 41, 47, 58, respectively. (*Post, pp.* 648-650.)

Acts cited and construed: Acts 1909, ch. 336; Acts 1919, ch. 118, secs. 33, 38, 76.

Cases cited and approved: State v. Wheeler, 127 Tenn., 58; State v. Pollard, 124 Tenn., 127.

9 **STATUTES.** Statutes will be construed so as to permit all to stand if possible.

Statutes will be construed so as to permit all to stand if possible. (*Post, pp.* 650, 651.)

---

*Headnotes 1. Warehousemen, 40 Cyc., p. 426; 2. Warehousemen, 40 Cyc., p. 410; 3. Warehousemen, 40 Cyc., p. 410; 4. Warehousemen, 40 Cyc., p. 417; 5. Warehousemen, 40 Cyc., p. 422; 6. Warehousemen, 40 Cyc., p. 423; 7. Statutes, 36 Cyc., p. 1119; Warehousemen, 40 Cyc., p. 423; 8. Warehousemen, 40 Cyc., p. 423; 9. Statutes, 36 Cyc., p. 1146.

---

FROM HAMILTON.

---

Appeal from the Chancery Court of Hamilton County. —HON. W. B. GARVIN, Chancellor.

CHAS. C. MOORE, for complainants.

ALLISON, LYNCH & PHILLIPS, for Nixon.

MR. CHIEF JUSTICE GREEN delivered the opinion of the Court.

These two cases involve the same questions and were heard together below and in this court.

The defendant Nixon placed an order with Silverman, a stockbroker in Chattanooga, for two hundred shares of Midvale steel stock and two hundred shares of Mar-

land oil stock. Silverman got the stock, and Nixon paid him for it $11,530. Nixon was buying for investment, and it was agreed between him and Silverman that the latter would procure a transfer of the shares of stock on the books of the two corporations, and procure new certificates in Nixon's name. Silverman undertook to send the certificates to New York for the purpose of the transfer, but the return of the certificates to Nixon was considerably delayed. Silverman excused the delay on one pretext and another, and finally claimed that the new certificates had been returned, but that they had been stolen out of his safe. Nixon having become somewhat suspicious by this time, Silverman, to protect him, turned over to Nixon warehouse receipts for thirty-four bales of cotton issued to complainant Starkey, indorsed by Starkey and by Silverman, and warehouse receipts for sixty bales of cotton, issued to different parties, but all indorsed by such parties, complainant Allison, and by Silverman. The receipts for the thirty-four bales had been placed with Silverman by Starkey. The receipts for the sixty bales had been placed with Silverman by Allison. Starkey and Allison were trading in futures through Silverman, and put up these warehouse receipts to protect their margins. The receipts appeared to be negotiable in form.

At about this time, Silverman, having become heavily involved, committed suicide. His estate was found to be insolvent. Nixon's shares, above referred to, were not discovered in Silverman's effects.

These two suits in replevin were brought by Starkey and Allison, each of them seeking to recover the warehouse receipts with which he had intrusted Silverman,

and which Silverman had turned over to Nixon as afore-
said. The chancellor rendered a decree in favor of the
complainants, and from this decree the defendant Nixon
has appealed.

Upon consideration of the testimony, which we have
orally discussed, we are satisfied that Silverman misap-
propriated the certificates of stock which he had bought
for defendant Nixon, and for which Nixon had paid, and
Silverman was, therefore, indebted to Nixon in a sum
equal to the value of the stock at the time Silverman gave
Nixon the aforesaid warehouse receipts. At this time,
Silverman promised to procure other shares of stock
for Nixon, identical with those first bought on this ac-
count, and we think the deposit of the warehouse re-
ceipts with Nixon must be taken as a pledge of those se-
curities by Silverman to secure his indebtedness to Nixon
or Silverman's obligation to Nixon to replace Nixon's
stock.

We are of opinion that the rights of the parties here-
to are controlled by the provisions of the Uniform Ware-
house Receipts Act (chapter 336 of the Acts of 1909),
although the complainants controvert such a conclusion
as will be presently noted.

One of the warehouses issuing the receipts in con-
troversy was located in Chattanooga, or in a suburb of
that city, and the other warehouse was located in Ala-
bama. The Uniform Warehouse Receipts Act has, how-
ever, been adopted in the State of Alabama also, so that
all the receipts were issued under the same law. Alabama
Laws 1915, p. 661.

As heretofore stated, all these receipts purport to be
negotiable. They are so entitled. Each recites that the

goods will be delivered to the order of a person named in the receipt. Acts 1909, chapter 336, section 5. It is insisted, however, that they fall short in two particulars of complying with the statutory essentials of valid warehouse receipts, and that they were not negotiable when pledged.

Section 2 of chapter 336 of the Acts of 1909 provides that, while warehouse receipts need not be in any particular form, every such receipt, among other things, must embody within its written or printed terms:

"(a)  The location of the warehouse where the goods are stored. . . .

"(f)  A description of the goods or of the packages containing them."

Section 3 of chapter 336 of the Acts of 1909 provides, in substance, that a warehouseman may insert in a receipt issued by him other terms and conditions not contrary to the provisions of the act, and which do not relieve him of the obligation to exercise reasonable care in regard to the goods. Some of the receipts involved contain a provision that "said cotton is accepted for storage for one year only from the date of this receipt, but upon surrender of this receipt said period may be extended or a new receipt issued at the option of" the warehouseman.

The complainants first urge that the receipts are defective in that they fail to sufficiently state the location of the two warehouses. The location of one of the warehouses is stated on the receipts issued by that warehouse to be in Chattanooga, Tenn. As a matter of fact the warehouse is located in East Lake, a suburb of Chattanooga, Tenn. The location of the other warehouse is

stated on the receipts issued by it to be in Stevenson, Ala. As a matter of fact it is located in that town. Each of the receipts is signed by the warehouseman issuing it.

We do not think that more precision in setting out the location of a warehouse issuing receipts is required than was employed in the receipts before us. The statement, on the receipts issued by the Chattanooga warehouse, that the warehouse was in Chattanooga, when in fact it was in a suburb of that city, is not misleading. A city, in common parlance, is ordinarily understood to include territory adjacent and beyond its actual corporate limits. There should be no difficulty in locating the warehouse when the name of the owner is given, and the town in which it is situated appears, the town not being a metropolis. Reasonably construing the statute, no such particularity in describing the location of a warehouse is required, as would be required in describing a parcel of real estate conveyed in a deed.

We do not think that the description of the goods is insufficient. Undertaking to describe the cotton stored, taking one of these warehouse receipts for illustration, it recites that it is a receipt for ''one bale of cotton,'' ''marks 556; weight 521; grade, strict Con rec'd. tinge; staple condition good.'' These descriptions seem entirely adequate to identify the goods according to the usages of the cotton trade.

The attack upon the negotiability of these warehouse receipts is based on the idea that because some of the receipts recited that the cotton was accepted for storage for one year only from the date of the receipts, and they were pledged more than a year after they were dated, the receipts were accordingly overdue, and, therefore,

not negotiable. No authority is cited to support this contention. We do not see why this circumstance should impair the negotiability of these warehouse receipts. The provision relied on was inserted for the benefit of the warehouseman, and the mere fact, that the cotton had been allowed to remain in the warehouse a little longer than the warehouseman originally contracted to keep it, did not cast suspicion upon the receipts. We do not think the case can be assimilated to that of a past-due note. The statute does not require that a warehouse receipt mature at "a determinable future time." On the contrary, section 5 of the Warehouse Receipts Act enacts that, "No provision shall be inserted in a negotiable receipt that it is nonnegotiable." These receipts being negotiable in form, it was beyond the power of the warehouseman to affect their negotiability by inserting other provisions therein.

We are of opinion, therefore, that the receipts in controversy are negotiable warehouse receipts under the statute, and if the defendant is an innocent purchaser of such receipts, in good faith, for value, without notice of any defect in Silverman's title, as he claims, he is entitled to hold them.

There can be no argument as to the defendant being a "purchaser," and for "value," on the assumption that chapter 336 of the Acts of 1909 applies. In section 58 of that act purchasers are declared to include "mortgagee and pledgee." In the same section it is declared that "an antecedent or pre-existing obligation, whether for money or not, constitutes 'value' where a receipt is taken either in satisfaction or as security therefor."

The only question at all open to discussion is whether defendant can be treated as a purchaser without notice. We think this question is resolved in his favor by the following sections of chapter 336 of the Acts of 1909.

"A person to whom a negotiable receipt has been duly negotiated acquires thereby:

"(a) Such title to the goods as the person negotiating the receipt to him had or had ability to convey to a purchaser in good faith for value, and also such title to the goods as the depositor or person to whose order the goods were to be delivered by the terms of the receipt had or had ability to convey to a purchaser in good faith for value; and

"(b) The direct obligation of the warehouseman to hold possession of the goods for him according to the terms of the receipt as fully as if the warehouseman had contracted directly with him." Section 41.

"The validity of the negotiation of a receipt is not impaired by the fact that such negotiation was a breach of duty on the part of the person making the negotiation, or by the fact that the owner of the receipt was induced by fraud, or duress, or mistake, to intrust the possession or custody of the receipt to such person, if the person to whom the receipt was negotiated, or a person to whom the receipt was subsequently negotiated, paid value therefor, without notice of the breach of duty, or fraud, mistake, or duress." Section 47.

"Second, a thing is done in 'good faith' within the meaning of this act when it is in fact done honestly, whether it be done negligently or not." Section 58.

These sections of the act must be construed together. Section 41 provides not merely for the negotiation of a

receipt by the owner thereof, as is argued, but likewise provides for the negotiation of a receipt by one not the owner. The language is that the person, to whom the receipt has been duly negotiated, acquires not only such title as the person negotiating the receipt had, but such title as the person negotiating the receipt "had ability to convey to a purchaser in good faith for value."

Section 47 strengthens section 41 in this particular and renders the legislative intent more definite. That is all. Commissioners' Note, 3 U. L. A., p. 81. The purchaser "without notice" of section 47 is the same character as the purchaser "in good faith" of section 41.

By this statute notice is to be tested by the good faith of the purchaser. He cannot be said to have acted in good faith, if he purchased with notice of an infirmity in the title to the instrument. Nor can he be said to have been charged with notice of such infirmity if he purchased in good faith. As just set out, a thing is declared by the statute to be done in good faith, "when it is in fact done honestly, whether it be done negligently or not."

It seems to us that the test of notice imposed by this statute is the same as that imposed by section 56 of the Negotiable Instruments Act (chapter 94 of the Acts of 1899) providing that to charge the purchaser of a negotiable instrument with notice he "must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

This section of the Negotiable Instruments Act has been considered by this court in many cases, among which may be mentioned *Bank* v. *Butler,* 113 Tenn., 574, 83 S.

W., 655; *Bank* v. *Chapman,* 122 Tenn., 415, 123 S. W., 641; *Corinth Bank & Trust Co.* v. *Security National Bank,* 148 Tenn., 136, 252 S. W., 1001. The first and last of these cases quoted and approved the language of the New York court of appeals in *Cheever* v. *Pittsburgh, etc., Co.,* 150 N. Y. 66, 44 N. E., 703, 34 L. R. A., 69, 55 Am. St. Rep., 646, to the effect that:

''The rights of the holder are to be determined by the simple test of honesty and good faith, and not by a speculative issue as to his diligence or negligence. The holder's rights cannot be defeated without proof of actual notice of the defect in title or bad faith on his part evidenced by circumstances. Though he may have been negligent in taking the paper, and omitted precautions which a prudent man would have taken, nevertheless, unless he acted *mala fide,* his title, according to settled doctrine, will prevail.''

As recently stated by this court in *Corinth Bank & Trust Co.* v. *Security National Bank,* the Negotiable Instruments Act abolished the old rule of constructive or implied notice formerly used in Tennessee in testing the *bona fides* of the purchaser of a negotiable instrument.

We are likewise of opinion that the Uniform Warehouse Receipts Act has abolished the old rule in its application to the purchaser of a document of this description. And the cases relied on by the complainants are not now authority.

We have fully considered the proof as to the circumstances under which the defendant acquired the warehouse receipts here involved. While it might be argued that he was negligent in taking these receipts without investigation, we see no evidence indicating that he acted

dishonestly or in bad faith. Nixon did not have actual knowledge that his own certificates of stock had been misappropriated by Silverman. He may have suspected something of the kind. A mere suspicion that Silverman had acted improperly in one matter would not impute knowledge that he was acting improperly in another. Even if Nixon suspected Silverman of wrongdoing, with reference to the certificates of stock bought on Nixon's account, he, nevertheless, may well have thought that Silverman, endeavoring to repair the wrong, was acting honestly and within his rights in the matter of the negotiation of the warehouse receipts. Silverman was in possession of these receipts, his reputation was good, and the receipts were indorsed in blank. Nixon at most could have only had a suspicion as to Silverman's lack of title, and a mere suspicion was not enough to charge Nixon with notice or deprive him of the *status* of a purchaser for value and in good faith. *Bank* v. *Chapman,* supra, *Corinth Bank & Trust Co.* v. *Security National Bank,* supra.

It is earnestly insisted by the complainants that chapter 336 of the Acts of 1909, in so far as it relates to a transaction like the one before us, was repealed by implication by chapter 98 of the Acts of 1915.

The caption and relevant sections of the latter act, known as the Factors' Act, are as follows:

"Bill to be entitled an act to regulate and fix the rights of factors or agents intrusted with possession of merchandise or in the possession of any bill of lading, custom house permit or warehouseman's receipt therefor.

"Section 1. Be it enacted by the General Assembly of the State of Tennessee, that every factor or other

agent intrusted with the possession of any bill of lading, custom house permit or warehouseman's receipt for the delivery of any merchandise and every such factor or agent not having the documentary evidence of title, who shall be intrusted with the possession of any merchandise for the purpose of sale or as a security for any advances to be made or obtained, thereon, shall be deemed to be the true owner therof, as far as to give validity to any contract made by such agent with any other person, for the sale or disposition of the whole or any part of such merchandise, for any money advanced or negotiable instrument or other obligation in writing given by such other person upon the faith thereof.

"Section 2. Be it further enacted that every person who shall hereafter accept or take any such merchandise in deposit from any such agent, as a security for any antecedent debt or demand, shall not acquire thereby, or enforce any right or interest in or to such merchandise or document, other than was possessed or might have been enforced by such agent at the time of such deposit."

If the Factors' Act applied to the case before us, there would be much force in this contention of the complainants by reason of section 2 of the act to the effect that a purchaser acquires only such right or interest as "was possessed or might have been enforced by such agent at the time of such deposit."

We think, however, that the scope of this act, undertaking to regulate and fix the rights of factors or agents, cannot be extended to agents generally who may be intrusted with documents of title. It seems to us that the intention was to define the rights of only such agents as were engaged in a business similar to that of factors;

agents such as commission merchants or consignees. In other words we think the rule *ejusdem generis* should be applied in the construction of this statute. That is, where general words follow special words, which limit the scope of the statute, these general words will be construed ordinarily as applying to things of the same kind or class as those indicated by the preceding special words. *State* v. *Wheeler,* 127 Tenn., 58, 152 S. W., 1037; *State* v. *Pollard,* 124 Tenn., 127, 136 S. W., 427.

So construing the act, the agents referred to would be agents engaged in a business similar to that of factors, and would not be agents engaged in the banking business or stock brokerage business, who in that capacity acquired warehouse receipts.

If the Factors' Act was given a different meaning and was construed to regulate the rights of agents generally acquiring documents of title, then this act would itself be repealed by implication, at least in this particular, by the Uniform Sales Act (chapter 118 of the Acts of 1919).

The Uniform Sales Act contains several sections fixing the rights of those handling documents of title, such as warehouse receipts. Section 33 of the Uniform Sales Act almost in terms re-enacts section 41 of the Uniform Warehouse Receipts Act; section 38 of the Uniform Sales Act likewise reenacts section 47 of the Uniform Warehouse Receipts Act; and section 76 of the Uniform Sales Act contains the same definitions of "purchaser," "value," and "good faith" as are contained in section 58 of the Uniform Warehouse Receipts Act.

It is our duty to construe the three acts so as to permit them all to stand, if possible. If the Factors' Act can

Starkey and Allison v. Nixon.

be saved at all, it can only be done by the restricted interpretation indicated.

Some other propositions have been submitted in behalf of the complainants which we have considered, but do not think that they require discussion.

For the reasons stated, we are of opinion that the chancellor's decree was erroneous, and this decree must be reversed, and the two suits dismissed.

Tax costs to complainants.

Remand.